## · 12095

## STATE v. CAMERON

### (135 S. E., 364)

1. HOMICIDE—INSTRUCTION DEFINING MANSLAUGHTER AS UNLAWFUL KILLING, USUALLY IN SUDDEN HEAT OF PASSION, HELD NOT ERRONEOUS BECAUSE OF USE OF WORD "USUALLY."—Instruction, in prosecution for assault and battery with intent to kill, defining manslaughter, and comparing it with assault and battery of high and aggravated nature, as being unlwful killing, "usually" in sudden heat of passion, *held* not erroneous because of use of word "usually."

2. CRIMINAL LAW.—It is common knowledge that mitigating circumstances which reduce homicide from murder to manslaughter occur in sudden heat of passion in vast majority of cases.

3. HOMICIDE—INSTRUCTION THAT KILLING, TO BE REDUCED FROM MURDER TO MANSLAUGHTER, MUST BE IN SUDDEN HEAT OF PASSION, SUDDENLY RAISED, HELD NOT ERRONEOUS.—Instruction, in prosecution for assault with intent to kill, that killing, to be reduced from murder to manslaughter, must have been in sudden heat of passion, instantly, suddenly raised, *held* not erroneous as having no reference to precipitate character of blow after provocation.

4. HOMICIDE.—Charge that· legal provocation, to reduce felonious killing from murder to manslaughter, must amount to assault on one who did killing or something of that kind, *held* not sufficiently comprehensive.

5.· HOMICIDE—INSTRUCTION ON REQUIREMENTS NECESSARY TO REDUCE MURDER TO MANSLAUGHTER HELD NOT ERRONEOUS BECAUSE OMITTING CERTAIN CONDITIONS, WHICH WERE NOT ESTABLISHED BY EVIDENCE. —Instruction, in prosecution for ássault with intent to kill, that legal provocation, reducing felonious killing from murder to manslaughter, must amount to assault on one doing killing, or something of that kind, *held* not erroneous for omission of conditions not established by ·evidence; defense being accidental shooting.

6. HOMICIDE—INSTRUCTION ON TEMPORARY INSANITY FROM CONTINUED INEBRIETY, BEING NO DEFENSE TO CRIME, HELD. HARMLESS, IN VIEW OF DEFENDANT'S ADMISSION THAT HE KNEW WHAT HE WAS DOING.— Instruction, in prosecution for assault with intent to kill, relative to temporary insanity, resulting from continued inebriety, being no excuse for crime, if erroneous, was harmless, in view of defendant's admission that he knew what he was doing.

NOTE: Effect of heat of passion which will mitigate or reduce the degree of a homicide, see note in 5 L. R. A. (N. S.), 809; 13 R. C. L., 792; 3 R. C. L. Supp., 84.

Effect of voluntary intoxication on degree of homicide, see notes in 12 A. L. R., 861; 23 A. L. R., 438.

7. CRIMINAL LAW.—Instruction, in prosecution for assault with intent to kill, requiring state to prove defendant's guilt to a moral certainty *held* not prejudical to defendant as imposing unnecessary burden on State.

Before HENRY, J., Kershaw, February, 1926. Affirmed.

John Cameron was convicted of assault and battery with intent to kill and he appeals.

*Mr. C. T. Graydon,* for appellont, cites: *Insanity is affirmative defense; may be raised under plea of not guilty:* 24 S. C., 439; 18 S. C., 514. *Defendant entitled to benefit of an issue raised by State's testimony* 49 S. C., 481. *"Reasonable doubt" refined:* 20 S. C., 441. *Duty of Court to charge law of accident:* 91 S. C., 235; 68 S. C., 304.

*Mr. A. F. Spigner, Solicitor,* for respondent.

November 3, 1926.

The opinion of the court was delivered by MR. JUSTICE COTHRAN.

Indictment for assault and battery with intent to kill; verdict, "guilty"; sentence, imprisonment for from five to ten years. Defendant appeals.

It is conceded that the prosecutor, B. L. Melton, while in his own store, in the town of Lugoff, in Kershaw county, received a wound in his arm from the discharge of a double-barreled shotgun, which resulted in the amputation of his arm. The state alleges that the wound was inflicted by the defendant with intent to kill and murder the said Melton. The defendant claims that the gun was accidentaly fired while he and Melton were struggling for its possession. No plea or claim of self-defense was interposed by the defendant. His defense was solely that the occurrence was an accident.

The evidence for the state tended to show the following facts: The day before the shooting the defendant got into a difficulty with a traveling man named Gary, in Melton's store, and drew a magazine pistol on the traveling man. Melton prevented him from shooting by pushing back the

"safety" catch on the pistol. The defendant, who was drunk at the time, desisted from his attempt, put the pistol in his pocket, and left the store. The next morning the defendant was still drinking, and about 30 minutes before the shooting told a witness that "he had a gun down there, and was' going to shoot somebody." He tried to buy shells from another witness, who refused to sell them to him. Shortly thereafter he went to Melton's store, and met him on the outside in front of the store, and claimed to have lost his gun (pistol). He told Melton that he had a grudge against him. Melton replied that it must be a good one. The defendant said to Melton, "Get your gun, I am going to kill you, and I want to give you a chance." Melton replied, "No," and went back in the store to the office. The defendant followed him, and said, "G— d— it, I am going to kill you," and shot. He threw up his gun the second time, but did not shoot. Melton caught the gun. The doctor testified that wound entered the back part of Melton's arm.

The evidence for the defendant tended to show that he had no ill will against Melton; that he remembered nothing about the alleged difficulty with the traveling man; that he was drinking the next day, and was preparing to go hunting; that he went with his shotgun into Melton's store following him after a conversation at the front between Melton and one Jones; that he went back and standing near the stove, and made a remark to Melton about the good fire he had; that Melton said that Rabon had told him that he (the defendant) was going out to kill a man; that Melton insisted on his leaving his gun in the store, which he declined to do, and, as he reached to pick it up, they both grabbed it, and in the scuffle over the gun it was discharged, striking Melton in the arm. The defendant admitted that he had been drinking, but added, "I knew what I was doing."

The exceptions are directed solely to alleged errors in the charge of his Honor, Judge Henry, as follows:

1. It is complained that his Honor, in assimilating the offense of asault and battery of a high and aggravated nature to the offense of manslaughter, committed error in defining manslaughter as follows: "Manslaughter is the unlawful killing of a human being, usually in sudden heat and (of?) passion upon sufficient legal provocation"; the specific objection to this portion of the charge being in the use of the word "usually." It is a matter of common knowledge that the mitigating circumstances which reduce a homicide from murder to manslaughter occur under the condition stated, "in sudden heat of passion," in the vast majority of cases. They may have occurred not under the condition of "sudden heat of passion," as in a case of accident due to gross or reckless negligence. *State v. Davis,* 128 S. C., 265; 122 S. E., 770. *State v. Williams,* 131 S. C., 294; 127 S. E., 264. The word "usually" necessarily implies that they may have occurred under other conditions than of "sudden heat of passion," and therefore does not constitute reversible error, if error at all. It is true that the lapse of an appreciable time between the act of "legal provocation" and the fatal blow will not deprive the defendant of the reduction from murder to manslaughter, unless he has had sufficient cooling time during the interval (*State v. Jacobs,* 28 S. C., 29 at page 32; 4 S. E., 799. *State v. McCants,* 1 *Speers,* 384); but even under these circumstances the claim of reduction of the offense for murder to manslaughter rests still upon the condition of "sudden heat of passion," which is supposed to have continued in full force during the interval. We do not think, therefore, that this assignment of error can be sustained.

2. It is complained that under the circumstances stated in subdivision 1 above his Honor committed error in charging the jury:

"It must be a legal provocation in order to reduce the killing from murder to manslaughter. And you will answer the question,, "Did he kill him out of that legal provocation?" If so it must be sudden heat and (of?) passion,

instantly, suddenly raised. If so, why that would reduce the killing from murder to manslaughter,"—the specific objection to this portion of the charge being that the sudden heat of passion "may have been raised some time before (the killing?), and the question whether or not the defendant had had sufficient time to cool is a question for the jury."

The proposition upon which the counsel for the appellant appears to rely is that it is not essential that the fatal blow shall have been delivered instantly upon the provocation, but the defendant has the right to rely upon "sudden heat of passion," provided he has not had suffifficient cooling time to recover his normal mental poise. In this he is correct, as above indicated; but the charge was to the effect that the heat of passion must have been "instantly suddenly raised," and had no reference to the precipitate character of the blow after the provocation. In *State v. Smith,* 10 Rich., 347, the passion which reduces a felonious killing to manslaughter is characterized as a "temporary frenzy, excited by sufficient legal provocation"; and in *State v. Mc-Conts,* 1 *Speers,* 390, *Judge Wardlaw* speaks of this passion as "the violent impulse of anger outstripping the tardier operations of reason, * * * provoked by sufficient cause." See, also, *State v. Davis,* 50 S. C., 405; 27 S. E., 905; 62 Am. St. Rep., 837. We perceive, therfore, no error in charging that the "heat of passion" must be "instantly and suddenly raised."

3. It is complained that under the circumstances stated in subdivision 1 above his honor committed error in charging the jury that the legal provocation necessary to reduce a felonious killing from murder to manslaughter must be 'such as would amount to an assault upon the man who did the killing, or some attack on him, or something of that kind"; the specific objection to this portion of the charge being that "many things other than an actual assault by the deceased may reduce murder to manslaughter. * * * A man might negligently and carelessly discharge a gun, and that

25—S. C. 137

might constitute manslaughter. * * * (An example) very pertient to the issue at bar."

In other words, it is contended that, as there was some evidence in the case from which the jury may have concluded that the injury resulted from the criminal carelessness of the defendant, they may also have concluded that, if death had resulted, the offense would have been manslaughter, and that consequently the defendant should not be convicted of a higher offense than assult and battery of a high and aggraveted nature.

There is no doubt but that the charge was not sufficiently comprehensive of all of the conditions under which a homicide may be reduced from murder to manslaughter. The condition mentioned was only one of them, where the legal provocation consisted of a personal assault, which created the "sudden heat of passion." The required condition may be presented where a wife is surprised in the guilty embrace of a paramour. No assault upon the slayer is required in such a case. The legal provocation creating the sudden heat of passion is presented. Or when a trespass is committed under aggravating circumstances, such as the destruction of property. No assault upon the slayer is required in such a case. The legal provocation creating the sudden heat of passion is presented. Or where the criminal carelessness in the handling of firearms has caused the homicide. No assault upon the slayer and no heat of passion is required to be shown yet the offense will be manslaughter.

If, therefore, the defendant had made any claim that the homicide was the result of his criminal carelessness in handling the gun, or if the evidence had presentd facts from which such an inference would have been justifiable the presiding judge should have left that theory of manslaughter (or in this case assault and battery of a high and aggravated nature) open to the jury. But such is not the case. The defendant made no such claim, and there is not a particle of evidence in the case to sustain it. The State pre-

sented a case of premeditated and malicious assult and bat-tery. The defendant presented a case of accident pure and simple—that the gun was accidentally discharged while he and the prosecutor were struggling for its possession. The presiding Judge should certainly not be charged with errror in omiting the condition now claimed, where there was no evidence tending to establish it and no request for a charge in reference to it. The issue was sharply drawn between assault and battery with intent to kill and murder, and a purely accidental injury. There was not the slightest evi-dence to have sustained a verdict of manslaughter if death had resulted, and we question very much the propriety of giving any instructions at all upon the matter. The judge gave a satisfactory explanation of the defense of accident, pure and simple.

It has been exceedingly difficult to lay hands upon a sat-isfactory definition of "legal provocation."

For nearly 100 years no improvement has been made up-on the declaration of this court in the case of *State v. Fer-guson* 2 Hill 619; 27 Am. Dec., 412, where Judge David Johnson delivering the opinion of the Court, concurred in by Judge O'Neall and Harper, declared:

"There must however be a provcation, a reasonable pro-vocation and what will or will not constitute reasonable provocation is perhaps the only difficulty in applying the-otherwise well defined distinction between the crimes of murder and manslaughter. The line which distinguishes between those provocations and which will not extenuate the offense, is not, nor can it be, certainly defined. Those pro-vocations which are in themselves calulated to provoke a high degree of resentment, and which ordinarily superinduce a great degree of violence, when compared with those that are slight and trivial, and from which a great degree of violance does not usually follow, may serve as a general outline to mark the distinction, and when applied with judgment and discretion, will usually lead to correct results. Decided cases furnish practical applications of the principle, and are of in-

finite use in carrying it out. According to those, it is now well established that no provocation, however grieveous, will operate to 'excuse the slayer of the crime of murder, when, from the weapon used, or from the manner of the assault, and intention to kill or to do some great bodily harm was manifest, unless it was accompanied by some act of unlawful violence, or denoting an intention to do bodily harm; nor will even a trival provocation extenuate the offense, although in point of law it may amount to an assault, if the punishment inflicted is outrageous in its nature, either in the manner or circumstance of it, and beyond all proportion to the provocation; because it manifests rather a diabolical depravity than the frailty of nature." Substantially reproduced in 13 R. C. L. 792.

It is complained that his Honor committed error in charging the jury that temporary insanity resulting from continued inebriety is no excuse for crime. We think that what his Honor meant to charge, and did charge, was the conceded principle that temporary drunkenness is no excuse; but that, if by continued drinking the defendants's mind has been so affected as to practically destroy his reason and the power to discriminate between right and wrong, he should be acquitted. *State v. Bundy,* 24 S. C., 439; 58 Am. Rep., 263. . See extended note in 12 A. L. R. 861. Whatever error may heve been made was rendered harmless by the admission of the defendant "I knew what I was doing."

It is complained that his Honor charged the jury: "Before you convict anybody of crime you must be convinced of their guilt; you must be convinced to a moral certainty in your own mind that he is guilty, and that means you have no reasonable doubt about his guilt, and a reasonable doubt is a doubt growing out of the evidence."

The specific objection to this portion of the charge is in requiring the State to prove the guilt of the defendant to a moral certainty. His Honor thus imposed upon the State

a greater burden than the law requires—proof beyond a reasonable doubt. We perceive no reason for assuming that the defendant was prejudiced by imposing such additional burden upon the State.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.

MESSRS. JUSTICES WATTS, BLEASE and STABLER and MR. ACTING ASSOCIATE JUSTICE RAMAGE concur.

MR. CHIEF JUSTICE GARY did not participate.