7581

STATE v. COYLE.

1. SELF-DEFENSE.—Under the plea of not guilty and evidence as to who struck first blow, it is not error to instruct jury as to law of self-defense, although this defense is not set up by defendant.
2. CHARGE.—Instructing jury here as to law of self-defense and submitting to the jury whether he was justified as a man of ordinary reason and firmness in doing as he did do, was not a charge as to the facts. An instruction not assuming as true any fact in issue, not undertaking to state the testimony, nor in any way conveying the Court's opinion of the testimony, is not on the facts.
3. SELF-DEFENSE—ISSUES.—In applying the law of self-defense what a man of ordinary firmness or courage would have done or should have done under the circumstances, is a question of fact for the jury.
4. IBID.—INSANITY arising during the progress of a difficulty as the result of a blow rightfully inflicted by his adversary in a difficulty voluntarily brought on by defendant, will not excuse him for his after conduct in the affray.
5. INSANITY.—The charge here submitting to the jury the question of insanity under the evidence was more favorable to defendant than he was entitled to.
6. REHEARING refused.

Before MEMMINGER, J., Greenwood, October, 1908. Affirmed.

Indictment against Jeff Coyle for assault and battery of a high and aggravated nature. From sentence, defendant appeals.

· *Mr. D. H. Magill,* for appellant, cites: *Injecting plea not involved is error:* 68 S. C., 276, 304; 3 Brick. Sach. on Ins., sec. 3383. *Insane man not responsible for his acts:* 12 Cyc., 164, 166; 39 S. C., 97; 30 S. C., 74; 24 S. C., 439; 18 S. C., 514; 12 Cyc., 175; 1 Strob., 479; 70 Pac., 1075.

*Solicitor R. A. Cooper,* contra, oral argument.

The opinion in this case was first filed February 23, 1910, but remittitur held up on petition for rehearing until

May 14, 1910. The opinion of the Court was delivered by

MR. CHIEF JUSTICE JONES. Defendant tried for assault with intent to kill Julian Still, was convicted of assault and battery of high and aggravated nature, and sentenced to eight years at hard labor in the State penitentiary.

The exceptions relate solely to the charge, but a statement of the testimony will help to make clear the points involved.

The testimony for the State was as follows:

Julian Still: "I live at the Greenwood Cotton Mill. I am 22 yeards old, and am married. I had a difficulty with Jeff Coyle on the night of August 15, somewhere about eleven o'clock. I don't know what his condition was, he seemed to be drinking. When I came up to where Coyle was I asked Mr. Christian if there was any trouble, and Coyle spoke up and said, I have had some trouble—said come here, I will tell you about it. He had out his knife.

I told him to put up the knife and I would come over there. He said he wouldn't do it. Coyle caught hold of my arm and followed me about ten steps and told me to stop, he wanted to tell me about the trouble. I said, all right, I will stop. He asked me if I didn't remember about six years ago when him and my father had a fuss. I said yes, and he began talking about it. He started at me with his knife open, and I knocked him down and walked over him, and started to hit him again, but I didn't, and walked off six or eight steps, and he got up and started towards me. He kept coming on me, and I backed ten steps and turned, and he ran up and stabbed me in the left side, and I ran toward the railroad and he cut me in the back. I ran up the street, and he knocked me down and began beating me. I hollered and he kept on beating me. I got up and ran in Will Joe Dean's yard, and he ran behind me and knocked me down again, and went on out through the back way. I think he cut me about ten times. The stick was an iron rod covered with leather. It was my stick. That is what I knocked him down with."

Cross-examination: "I was going in the opposite direction from my home when I went where Coyle was. I went there because I heard one of the Still boys and Coyle was in a fuss. I went there because I heard Coyle was down there. I bought this stick that night before I went to where Coyle was. The stick had a metal head, and is a tolerable heavy stick. You could brain a man with it if you hit him hard enough. I struck Coyle with that stick before he cut me, but he was coming toward me with a knife."

Dr. R. B. Epting testifying as to the wounds received by the prosecutor, found that he was prettly badly injured with the twelve or fifteen cuts on him, some cuts entering the cavity of the lungs.

Dr. J. B. Owens testified that he next day dressed a wound on side of the defendant's head across the ear, and that it looked like a pretty severe lick.

The testimony for the defense was as follows:

Jeff Coyle: "I am the defendant in this case. I was on my way home that night. I had a quart and a pint of whiskey in a basket, and Julian Still overtook me and asked me to give him some of the whiskey, and I told him I could not give it to him because it wasn't mine, and he says, No, you are too damned stingy—those are the words he used. I says, If it was my liquor I would give it to you; you would be welcome to it. He says, I haven't forgot about how you treated my father three or four years ago, by whipping him over at the old mill. I says, me and your father has done settled that long ago. And he stepped back from me with his stick and says, I have never settled it with you, and knocked me down with the stick. He didn't give me a moment's warning. After he knocked me down I couldn't tell what happened. He knocked me crazy. I couldn't give account of anything after he hit me with the stick. I will be honest, before God in heaven, he knocked me so crazy I didn't know anything. I don't know what I did. He struck me on the left side of my head. I never had a cross word with Julian Still in my life, and had nothing at all against him. I do not know whether I cut him or not. My physical condition is very weak. I have kidney trouble and lung trouble. Doctors have treated me for three years. I suffered with the wound I received from this stick for two weeks, and I felt as if I would die from it. After I came to my senses I went and surrendered to the sheriff, when I was told what had happened."

Cross-examination: "When I came to myself I was at home. I have no idea how I got home. I might have run this boy around and cut him up for all I know. My wife took me over to her sister's after I came to myself, at her suggestion. I was not drunk, I can prove by the officers of this town I don't get drunk. My wife's brother came over and told me the next morning about Julian Still being cut,

and said they accused me of doing it, and I came and gave up, and that is the first I knew of it."

Redirect examination: "I was not drinking that night. I drank a bottle of beer that afternoon about four o'clock. That is all I drank. I did not cut at Still before he struck me with the stick. I carried the stick off with me, I suppose, I had it at home the next morning, but I didn't know anything about having the stick until my wife asked me where I got it."

In charging the law as to self-defense, the Court said:

"Now, there is involved in here the law as to self-defense and the law upon that point is, that where any one undertakes to escape responsibility for cutting or shooting a man or otherwise injuring him, on the ground of self-defense, the law requires him to satisfy the jury by the greater weight of the testimony; first, that he was free from fault in bringing on the difficulty; second, that he could not have retreated from the difficulty without probably endangering his safety; and third, that it was necessary for him to use such force as he did use in order to protect himself from the loss of life or from serious bodily harm, and that from the standpoint of a man of ordinary firmness and courage— you place the defendant, the man seeking to escape on the ground of self-defense, when you are considering that plea in this case, you place in his position a man of ordinary firmness and courage, the standard which the law gives you to measure a man by, and you say what he would have done and should have done, under the circumstances, from the dangers by which he was surrounded, either real dangers or appearances of danger—whether he would have been justified in believing that he was in danger of the loss of his life or serious bodily harm, and therefore, was justified in doing as he did do."

The specifications of error are:

(a) "In instructing the jury that the law of self-defense was involved in this case when the defendant made no such

plea, nor did the testimony involve such plea; on the contrary, the plea being not guilty by reason of irresponsibility on account of such a dethronement of his reason as to render him incapable of distinguishing between right and wrong or knowing what he was doing at the time of the alleged assault and battery.

(b) "By charging on the facts in telling the jury that the defendant was seeking to escape on the plea of self-defense, which was tantamount to telling them that he admitted the assault and battery, and that in order to escape, he must prove what is required to establish such plea, by the greater weight of the evidence, in order that he might be justified in doing what he did do.

(c) "In submitting to the jury to decide what a man of ordinary firmness and courage, situated as the defendant was situated, 'should have done under the circumstances' to submit such question to the jury, being to submit to them the decision of a question of law.

(d) "In charging on the facts by placing the defendant in the attitude of seeking to escape on the ground of self-defense, and speaking of him as having done as he did do."

As to specification (a), the defendant's plea was simply not guilty. The Court was not advised that the defendant relied solely on the defense of insanity. It appears that each of the parties struck the other with a deadly or dangerous weapon, and there was an issue in the testimony as to who made the first assault, the prosecutor testifying that the defendant was attacking him with an open knife before he struck the defendant with the heavy stick, and defendant testifying that he was not cutting prosecutor with a knife when the prosecutor struck him, and that if he cut the prosecutor it was after prosecutor had knocked him down with the stick. There is no contention that defendant was insane previous to the blow which he received in the difficulty. It is manifest, therefore, that

there was no impropriety in charging the law as to self-defense.

As to specifications (b and d). We fail to see how the charge could be construed as a charge on the facts. The charge did not assume as true any fact in issue, did not undertake to state the testimony, and in no way conveyed to the jury the Court's opinion as to the testimony.

As to specification (c), it is sufficient to say that in applying the law of self-defense, what a man of ordinary firmness and courage would have done and should have done, under the circumstances, is a question of fact for the jury.

The second exception is as follows:

2. "Because it was error to charge the jury as follows: 'Now, if by a blow inflicted upon him, a man's reason became utterly dethroned, if he so absolutely lost his intelligence as not to know what he was doing at all, not to know right from wrong—the standard under our law in this State —so that he did not know what he was doing, or that it was wrong to do it, and he went and cut the other man as a man who was insane, suffering from such degree of insanity as not to know right from wrong, why he would not be responsible for what he did then, unless he was at fault in bringing on the difficulty in which he got the blow which deprived him of his reason. Of course, if he was at fault and brought on a difficulty, forced the man to protect himself from the loss of his life or serious bodily harm, to strike him, and as a result of that blow rightfully inflicted by the other man, and wrongfully brought upon himself by his own conduct, he became deprived of his reason and went on and cut or killed the man, of course, the law would hold him responsible for what he did, even although he did not then know what he was doing, because he would have been in the wrong in bringing himself into that condition;' the error being:

(a) "In holding and charging that a person in such condition and under such circumstances would be responsible, under the law for what he did, when, it is submitted, it is the law of this State that it matters not whether the mind be destroyed by the acts and doings of the accused, or by the touch of the finger of God, if the fact of insanity existed at the time of the commission of the alleged offense, the defendant can·not be legally convicted.

(b) "In taking from the jury the only defence of the defendant, except that of not guilty, and in submitting to them the plea of self-defense, which we did not interpose, if indeed, the defendant had satisfied the jury beyond reasonable doubt even of his insanity at the moment the alleged offense was committed.

(c) "In saying to the jury that a man in the condition he describes mentally would be responsible if he was at fault himself in bringing on the difficulty in which he got the blow which deprived him of his reason, such being calculated to impress the jury with the fact that his Honor believed that the defendant brought on the difficulty in which he got the blow when there is no proof to warrant such belief or to justify such charge."

As to specification (c), it appears by reference to the testimony of the prosecutor that defendant was attacking prosecutor with a knife when he received the blow alleged to have made him temporarily insane. Specification (b) has been disposed of in considering the first exception.

We do not think specification (a) shows error. The charge is based upon the hypothesis that the jury might accept the prosecutor's version that defendant assaulted him with the deadly weapon before he struck defendant. According to this view, defendant was admittedly sane and responsible at the inception of the difficulty. "Insanity" arising during the progress of a difficulty voluntarily brought on by defendant, and as the result of a blow rightfully inflicted by his adversary, should not constitute

excuse for his after conduct in such difficulty. The reason which sustains the settled law in this State—that voluntary intoxication is no excuse for crime—applies with as great force in a case of this kind.

Moreover, the charge was very favorable to defendant in submitting the question of insanity to the jury. The defense rested solely on the unsupported statement of defendant as to the condition of his mind, and this testimony practically amounted to nothing, but a statement that he did not remember what he did that night after the prosecutor struck him, by the defendant's showing his memory was completely restored next morning, except as to his acts to the prosecutor after the blow. There was no evidence by the physician who attended him that the blow was such as might have caused temporary insanity. There was no evidence of any delusion and no evidence that defendant did not at the time of his acts have mental capacity sufficient to know that his conduct was wrong. The barbarity of his conduct afforded no evidence of irresponsible insanity. All the evidence tended to show that defendant acted in a frenzy of passion or revenge, not engendered by a mind so diseased as to destroy capacity to know that his acts were wrong.

The judgment of the Circuit Court is affirmed.

May 14, 1910. PER CURIAM. After due consideration the Court is unable to discover that any material question of law or fact has been overlooked or disregarded.

It is, therefore, ordered that the petition herein be dismissed and the order heretofore granted, staying remittitur, be revoked.