14892

STATE v. McGILL

(3 S. E. (2d), 257)

May, 1938.

*Messrs. J. D. Lanford, C. Victor Pyle* and *C. A. Cappell*, for appellant,

*Messrs. Robert T. Ashmore, Solicitor,* and *T. A. Wofford,* for respondent,

June 8, 1939.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

The defendant, Otis McGill, a young white man, was indicted and tried for murder at the May, 1938, term of the Court of General Sessions for Greenville County. He was found guilty as charged and sentenced to die by electrocution. His appeal to this Court, as stated and argued by his counsel, presents the following questions for decision:

"1. Was there error in amending the indictment by changing the name of the deceased; in refusing the motion to quash the indictment; and in forcing the defendant to trial on such amended indictment?

"2. Were the rights of the defendant prejudiced by the manner of cross examination of the defendant by the solicitor?

"3. Were the rights of the defendant invaded and prejudiced by the arguments of associate counsel for the State and the Solicitor, in their references to him and to his acts?

"4. Was the right of the defendant to a fair and impartial trial invaded and prejudiced by the action of the Clerk of Court in passing a series of notes to the Solicitor in the presence and sight of the jury?

"5. Did his Honor, the trial Judge, err in his charge to the jury upon the test of insanity in this State?"

These questions are fairly raised by the exceptions and will be considered in the order named.

First. The indictment as found by the grand jury ▪ charged the defendant with having killed and murdered one A. P. Southern. Upon the call of the case for trial, but before arraignment of the accused, the solicitor moved the Court to be permitted to amend the indictment so as to allege the true and correct name of the deceased to be A. P. Southerlin. Counsel for the defendant objected on various grounds, but the trial Judge allowed the amendment for the reason, as stated by him, that its effect was merely to correct the wrong spelling of the name of the person killed. The appellant contends that this was error; that the name of the deceased is a vital and material allegation of the indictment, and cannot be corrected as was here attempted to be done.

Section 1005 of the Code of 1932 provides that: "If there be any defect in form in any indictment it shall be competent for the court before which the case is tried to amend the said indictment: Provided, Such amendment does not change the nature of the offense charged. * * * " In *State v. Blackstone,* 113 S. C., 528, 101 S. E., 845, 846, an indictment charging violation of the prohibition law was amended upon the call of the case for trial, by inserting therein the true and correct name of the accused. This Court held on appeal that what is now Section 1005 of the Code permitted the amendment as it did "not change the nature of the offense."

The exact question here presented, whether an amendment of an indictment may properly be allowed for the correction of a misnomer as to the name of the deceased, has not been passed upon by this Court. No good reason appears, however, why the holding of the Court in the *Blackstone case,* to wit, that an amendment is permissible to correct the name of the accused, should not be applied with regard to the deceased. Here, as in the *Blackstone case,* the amendment "does not change the nature of the offense charged." There was no change in the identity of the victim of the homicide, but only in the name. The error being merely a matter of form,

therefore, and not one of substance, the amendment was clearly proper under Section 1005 of the Code.

This view is in accord with the decisions of other jurisdictions. In 7 A. L. R., 1525, the annotator makes the following statement: "Under statutory authority to amend in matter of form, it is held that the Court may properly allow the amendment of an indictment in correction of a misnomer as to the name of the victim of a homicide, such error being considered a defect in form only. Distinction is to be made between a change in the name and a change in the identity of the victim, the latter being a matter of substance, and not the subject of amendment"—citing cases. See also 68 A. L. R., 929.

Counsel for the appellant cite the following cases in support of their contention: *State v. Coleman,* 17 S. C., 473; *State v. Blakeney,* 33 S. C., 111, 11 S. E., 637; *State v. Platt,* 154 S. C., 1, 151 S. E., 206. An examination of these decisions, however, discloses that the holding of the Court in each of them was predicated upon a question of jurisdiction. They are not, therefore, applicable to the case at bar. Nor does *Clark v. State,* 100 Miss., 751, 57 So., 209, 38 L. R. A. (N. S.), 187, Ann. Cas., 1914-A, 463, lend any support or comfort to the position of the appellant. It appears from the opinion that the amendment was there allowed after the jury had returned a verdict. The Court indicated that if it had been made at the proper time the question would have been a different one.

As to the error alleged in Exceptions 2 and 3, it is sufficient to say that the amendment being permissible, as we have held, the trial Judge was correct in refusing the motion to quash the indictment, made upon the ground that there was "a material variance from the proper name of the deceased"; and that he was right in ordering the case to trial on the indictment as amended.

Second. When the defendant was on the stand he testified that Southerlin, on the afternoon of February 18, 1938, came to the home of one Pauline Cooper where the witness

lived; that after staying there for some time, he asked the appellant to go out and buy a pint of whiskey giving him 50¢ with which to make the purchase; that when he returned with the liquor, a dispute arose as to how much money Southerlin had given him; that the deceased, who was large and strong, advanced upon him with a hammer and struck him on the side of the head, partly felling him to the floor, and as there was no way of escape, Southerlin being between him and the door, he seized a chair and knocked him out upon the porch and off the porch to the ground, when the mind of the defendant became a blank, and he could not remember doing thereafter any of the things which witnesses for the State testified he had done. He claimed that he killed Southerlin in self-defense and also pleaded the defense of temporary insanity.

On cross examination, the solicitor questioned him vigorously with regard to these matters—the manner in which he claimed the deceased had advanced upon him and struck him with a hammer and as to what caused his lapse of memory. In doing so, it appears that he approached the witness with the hammer which had been introduced in evidence, and sought to show by demonstration just how the defendant claimed that Southerlin had advanced upon him, but against which the witness protested by saying "don't you hit me." Counsel then objected to such cross examination as improper and asked the Court to require the solicitor to stand back from the witness when questioning him. Later counsel also objected to the way the solicitor asked the defendant certain questions, stating "he has no right to laugh at the witness like that"; and still later an objection was made "to the solicitor raving at him that way." The Court sustained the objection and admonished the solicitor not "to talk so loud."

Counsel for appellant, while conceding that "a defendant who testifies in his own behalf subjects himself to cross examination and to proper attack," contend that the attitude, acts and language of the State's attorney "were so violent, harassing and abusive" that the ef-

fect was to prejudice the defendant and his defense in the eyes of the jury. We have read with particular care that part of the cross examination about which complaint is made, and are of opinion that this question should be answered in the negative. Of course, in cross examining a defendant who testifies on his own behalf, the solicitor should not approach the witness so closely as to embarrass or intimidate him, as is here charged; and certainly the use of violent or abusive language will not be allowed or condoned by the Court. It appears, too, that it was unnecessary to question the defendant in an unusually loud voice, as it is not claimed that he was deaf or even hard of hearing. As to that, however, the trial Court sustained the objection thereto, and the solicitor, as he himself states, thereupon "calmed down." Furthermore, as we have repeatedly held, conduct of a trial is left largely to the discretion of the presiding Judge, and this Court will not interfere unless it clearly appears that the rights of a complaining party were abused or prejudiced in some way. In the case at bar, the fair and able Circuit Judge heard and saw how the solicitor was conducting or prosecuting the cross examination of the defendant, and could thus easily determine whether his way or manner of doing it was proper or improper. He was in a better position to judge than we are, as we have before us only the printed record, which leaves much to inference as to what really happened. With all of the facts in his possession, Judge Oxner held, in passing upon a motion for a new trial, that the rights of the defendant were not prejudiced as claimed; and we cannot say, upon full consideration of the question, that he was wrong in so holding.

Third. Exceptions 5 and 6 raise this question. They charge that the solicitor and the associate counsel for the State made certain remarks in their arguments to the jury which had the effect of depriving the defendant of a fair and impartial trial.

It appears that the alleged comments were not objected to when made, and that the trial Judge was not called upon to

rule thereon at that time. The language used, however, as counsel for the appellant understood and recalled it, was made grounds of the motion for a new trial. It was claimed that the assistant prosecutor had "attacked the conduct of the defendant to the extent of saying to the jury that the good citizens who were by-standers should have shot the defendant down like a dog"; and that the solicitor had compared him to "the cannibals of Borneo," and denounced him "as being the worst human being that had ever been reared in Greenville County, or words to that effect." On the hearing of the motion, the trial Judge said: "I just simply don't recall all of those arguments; I undertook to give close attention to them, but I don't recall everything that was said: I would not want to trust my memory on it." He then asked Mr. Wofford, counsel who assisted in the prosecution, to give his version of the matter. This he did, stating that what he did say, in reviewing the testimony, was "that why those good people who saw the defendant beating Mr. Southerlin didn't shoot this defendant while he was beating Mr. Southerlin like a dog, God only knows, because they had a perfect right to do it." The solicitor said, in response to the Court's inquiry, that he merely argued the testimony, which he thought he had a right to do, and that the only time he was interrupted was when he referred to the electric chair, which the Judge ruled he probably ought not to have done, and that he did not mention it again. He further stated he told the jury in effect that to kill a man in such a way was doing it like a cannibal would do it—"like the cannibals of Borneo." Judge Oxner held that these admitted remarks were indiscreet, and that if they had been called to his attention, he would have stopped counsel; but he did not feel, in the circumstances detailed, that they were such as would warrant the granting of a new trial. On the whole matter, he held that he saw no prejudicial error in the record.

In *State v. Meehan,* 160 S. C., 111, 158 S. E., 151, 158, the rule is stated as follows: "The conduct of a trial must be left largely to the discretion of the pre-

siding Judge. One seeking a new trial because of unfair or improper argument on the part of counsel for the successful party should show these things: (1) That timely objection was interposed to the argument; (2) the substance, at least, of the objectionable language; (3) the failure of the court to sufficiently warn the jury not to consider the improper argument; and (4) that the result was to materially prejudice the right of the losing litigant to obtain a fair and impartial trial."

In the case at bar, counsel for the defendant, as we have said, did not object to the remarks which they now contend were hurtful to the appellant, or seek from the trial Court a ruling thereon at the time they were made, but raised the question for the first time as grounds of their motion for a new trial. And it may be fairly inferred from what the Circuit Judge said in denying the motion that he did not hear such remarks when made in argument. He could not, therefore, due to the failure of counsel to call his attention thereto, have made any ruling thereabout, even if it had been a "flagrant case and where prejudice clearly appears." *Price v. American Agricultural Chemical Company*. 178 S. C., 217, 182 S. E., 637, 639. For these reasons the Court might properly refuse to consider the question.

In view of the gravity of the case, however, we will look somewhat to the merits of the matter. "The rule that it is always the duty of the prosecuting attorney to treat the defendant in a fair and impartial manner applies to his argument to the jury." *State v. McDonald*, 184 S. C., 290, 192 S. E., 365, 370. He "is a *quasi*-judicial officer, and this Court has repeatedly held that a solicitor must not, because of the high position he holds, say things, or do things, which would have any effect to prevent a citizen, however humble, from obtaining the fair and impartial trial he is entitled to under the law." *State v. Parris,* 163 S. C., 295, 161 S. E., 496, 498. But this does not mean that he should not prosecute vigorously so long as he is just to the

defendant, his duty to the State being coexistent with his duty to see that the accused is given a fair trial.

We have read with care the entire voluminous record in the case. The testimony of Pauline Cooper, who saw the first blow struck, was to the effect that Southerlin was leaving the room in which they were at the time, and while he was passing through the door to the porch, with his back to the defendant, the accused struck him with a stool on the back of the head with such force as to break the stool into pieces, and that the deceased was knocked to the porch and therefrom to the ground. Other witnesses testified as to what occurred thereafter. They stated that while Southerlin lay upon the ground unable to speak or to raise his hand in defense of his life, his assailant beat upon him with a pole, and caught him by his feet and pulled him to a well a short distance from the house, expressing his determination to throw him in. He then beat him with a stick and jumped upon him with such force that he broke many of the ribs of the dying man, at the same time cursing him and telling him to die. He then struck a match for the purpose, as was testified he said, to burn the helpless man. Before and by that time a number of people had gathered nearby, but were afraid to approach the accused, who was later arrested by the officers after he had been shot down. As is seen from this testimony, which was accepted by the jury as true, and which the accused alone denied, the killing was done in a most horrible manner. In reviewing the evidence for the State, the assistant prosecuting attorney did not tell the jury that the defendant was a dog but did say, according to his own admission, that he beat Southerlin like a dog; and the solicitor did not state to the jury that the accused was a cannibal, but did tell them, as he admitted, that the manner in which he killed the deceased was like a cannibal would do it.

We think, as held by the trial Judge, that these comments were "indiscreet"; and they were unnecessary, as they added nothing to the real picture made by the evidence itself. How-

ever, we hold that Judge Oxner did not abuse his discretion in refusing to grant a new trial on this ground, as the remarks objected to, when considered in the light of the testimony for the State, were harmless. They may properly be regarded merely as metaphorical allusions, deducible from such evidence. We, therefore, reject the contention of counsel for the appellant that Exceptions 5 and 6 should be sustained.

Fourth. With regard to this question, we find the following statement in the transcript of record:

"While the defendant was on the stand, under the cross examination of the solicitor, one of the attorneys for the defendant observed that the Clerk of Court was passing a series of notes from his desk to Mr. Wofford at the State's table. This was just before Court adjourned for the day, and when Court adjourned, the attorney for the defendant was able to secure a few of these notes. They contained suggested questions for the solicitor to ask the defendant. The matter was brought to the attention of the Court the next morning in the absence of the jury, but no ruling on this matter was made until the motion for a new trial." Copies of some of the notes were exhibited to this Court and are contained in the Transcript of Record.

It is alleged that the rights of the defendant were prejudiced by the passing of these notes in the presence and sight of the jury, during the cross examination of the appellant, the specification of error being that the Clerk of Court thus "took part in the trial of the case and thereby evidenced to the jury a showing of partiality to the State and against the defendant." In their written argument, however, counsel for the appellant make this observation: "It is impossible to say just what effect this passing of the notes had. It is true that the jury did not know what these notes contained and we frankly state that so far as we know, none of the suggested questions were asked. Further, as can be seen from those secured and as set out in the Transcript of Record, they could not have been asked since they were incompetent and

improper questions." In refusing to grant the defendant a new trial, Judge Oxner disposed of the contention here made as follows: "As to the last ground, as I recall it, that the Clerk of Court passed some notes over to the solicitor, there was nothing to indicate what the notes were about, so far as the jury was concerned, and I don't see how that could be prejudicial in any way."

What the Clerk of Court is here charged with doing was so entirely wrong—and unusual, we hope—his duties not being connected in any way with the prosecution of the defendant, that we are constrained to think it was inadvertently done by him. But whether inadvertently done or not, it was a matter for the attention of the Court. As the jury did not see, however, and could not have known the contents of the notes written by the Clerk, as is conceded, we are satisfied that the rights of the appellant were in no way prejudiced by what happened. The Circuit Judge, therefore, was correct in holding as he did.

Fifth. It is here argued that the presiding Judge ■ erred in his charge to the jury upon the question of insanity by omitting the phrase "at the time of the act." In other words, that he failed to charge the full test as laid down in *State v. Bundy,* 24 S. C., 439, 58 Am. Rep., 263, and other decided cases.

In *State v. McIntosh,* 39 S. C., 97, 17 S. E., 446, 450, the Court declared that, "It is not simply the power to distinguish right from wrong that is prescribed; it is the power to distinguish right from wrong *in the act itself,* to recognize that *the act complained of* is either morally or legally wrong. When this power exists in a defendant at the bar of a court on trial even for his life, he must answer for his acts. Such is the law of this commonwealth."

In the case at bar, we think that the trial Judge, in his charge dealing with the question of insanity, which we have closely read, substantially stated the rule involved. He told the jury several times that the defendant was responsible for

his act if he had the power to distinguish right from wrong "in the act itself." While he did not use the exact phrase referred to by counsel for appellant—which it is always best and proper to use—we are satisfied that the jury fully understood, from the charge as made, that the lack of responsibility of the defendant for his act, because of mental unsoundness—the power to distinguish right from wrong in the act itself—had reference to a condition of his mind existing at the time of the "act itself"; that is to say at the time the act was committed. This assignment of error, therefore, is held to be without substantial merit.

Because of the serious plight in which the appellant finds himself, we have given much thought and consideration to the contentions made on his behalf. We find nothing in the record, however, that would warrant a reversal of the Court below. Under the overwhelming evidence offered on the part of the State, a jury of his countrymen have said that he is guilty of murder; and no good reason has been shown why this Court should interfere with their verdict. In this connection, we also desire to say that counsel who represented the defendant here and below were appointed by the trial Judge to do so, and that they served throughout the case without pecuniary reward. While they could not save the appellant from the consequences of his own acts, they did all that could be legitimately done on his behalf. The Court appreciates the services thus rendered by them and adopts this method of saying so.

The exceptions are overruled and the judgment of the Circuit Court is affirmed.

Messrs. Bonham, Baker and Fishburne concur.

Mr. Justice Carter did not participate on account of illness.