16293

**STATE v. MARTIN**
(57 S. E. (2d) 55)

130

*Messrs. Epps & Abbott,* of Conway, *for Appellant,* 

*Messrs. J. Reuben Long, Solicitor,* and *F. A. Thompson,* of Conway, *for Respondent,* 

December 13, 1949.

BAKER, Chief Justice.

At the March, 1949, term of the Court of General Sessions for Horry County, the appellant was tried on an indictment charging him with the murder of one R. B. Squires on November 19, 1948, near Conway, which trial resulted in a conviction of murder, with recommendation to mercy, and he was sentenced to imprisonment for the term of his life.

On this appeal therefrom, the appellant alleges that the trial Judge committed errors of law in the trial of the case and in his charge to the jury, in the following particulars: 1. In questioning two of the appellant's character witnesses, and in remarking adversely on the testimony of at least one of these witnesses. 2. In refusing to submit to the jury the defense of temporary insanity, and the plea of self-defense and the defense of his wife and of his castle. 3. In excluding from the consideration of the jury the question of manslaughter. 4. In refusing to charge the appellant's request as to evidence of good character (reputation?).

Issues 1, 2 and 4 will be disposed of very briefly, but the remaining issue has given us grave concern.

The cross-examination of the character witnesses for the appellant by the trial Judge, and his comments thereabout which practically destroyed any weight to be given to their testimony by the jury, would have amounted to prejudicial error if the appellant had been denying that he fired the fatal shot, but here it is an admitted fact that the appellant fired the shot, which was not accidental, that

resulted in the death of the deceased. It is usually better for the trial Judge to refrain from cross-examining witnesses and, always, from making any remark which may affect the weight to be given the testimony of a witness by the jury. But under the circumstances here, we find no reversible error. Nor do we think that the appellant's request to charge *as worded* in reference to good reputation, while fundamentally sound under given circumstances, was apposite to the facts of this case, although good reputation is an item of proof to be considered by the jury in all cases.

The appellant, when testifying, described in detail the circumstances prevailing at the time he fired the fatal shot, even to the direction in which the deceased was looking immediately prior to, and at the moment the shot was fired; and we are of opinion that the trial Judge did not commit error in refusing to charge the law as to temporary insanity and submit such issue to the jury. Nor is there any testimony sufficiently tending to establish self-defense or the defense of appellant's wife and castle at the time of the firing of the fatal shot, as to require such issue to be submitted.

As hereinbefore indicated, the troublesome issue in this appeal is whether the trial Judge committed error in refusing to charge the law of manslaughter, and leave to the jury the prerogative of rendering a verdict of guilty of manslaughter, under the facts of this case. The jury was limited to one of three verdicts, *viz.*, "Guilty"; "Guilty of murder with recommendation to mercy"; and "Not guilty." Of course, where a defendant is tried on an indictment charging murder, and there is no element of manslaughter in the case, then the trial Judge is not required to charge the law of manslaughter, and submit such issue to the jury. In fact, it is improper to do so. *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587. But in the instant case, the appellant insisted that the law of manslaughter be charged, in that the testimony was sufficient to raise such issue and should therefore be submitted to the jury.

"The distinction between murder and manslaughter, as put in the books, and as generally understood by the profession, is not merely an arbitrary rule, but is founded on a thorough knowledge of the human heart, and framed in compassion to the passions and frailties which belong to and are inseparable from our natures. We look in vain through all classes of society, for even one individual who has so much command of himself as to remain passive and unmoved when suffering under personal injuries. Passion arising out of even imaginary wrongs, frequently gets the ascendency of distempered minds, and even those that are better regulated are sometimes carried away by the ordinary 'ills which flesh is heir to.' These may, however, be subdued and overcome by a proper course of reflection and discipline, and it is our duty to keep them within proper bounds; but he who has suffered great bodily harm, the parent who sees his child, or the child who sees the parent, suffering under the hand of ruffian violence, or the husband who finds his wife in the embrace of an adulterer, does not stop to reason about the extent to which he will carry his resentment, and in proportion to the degree of provocation will be the almost certain excess of resentment; and if, under the influence of such an excitement, one man takes the life of another in whose wrong it originated, it is manslaughter and not murder. There must, however, be a provocation—a reasonable provocation, and what will or will not constitute a reasonable provocation, is perhaps the only difficulty in applying the otherwise well-defined distinction between the crimes of murder and manslaughter. The line which distinguishes between those provocations which will and will not extenuate the offense, is not, nor can it be, certainly defined. Those provocations which are in themselves calculated to provoke a high degree of resentment, and which ordinarily superinduce a great degree of violence, when compared with those that are slight and trivial, and from which a great degree of violence does not usually follow, may serve as a gen-

eral outline to mark the distinction, and when applied with judgment and discretion, will usually lead to correct results." *State v. Ferguson,* 2 Hill 619, 27 Am. Dec. 412.

We have in this case a most amazing factual situation as testified to by the appellant and his wife, and one in which it would be hard to place but little, if any credence, except for the corroboration in at least part thereof by Sheriff Sasser of Horry County, Sheriff Cribb of Georgetown County, and by Dr. Henry C. Brooks and Dr. H. B. Holmes of Conway. On three occasions prior to the day on which the deceased was shot and killed, he would have been either prosecuted for rape, or shot and killed on sight by the appellant, had the appellant and his wife occupied a different status in society. In writing this, we do not intend to infer anything derogatory to the moral character of the appellant and his wife, but accept the statement of his counsel that they are very ignorant people, who had been put in great fear for their lives, but who had appealed to the chief law enforcement officers of the respective counties wherein they were domiciled following the occurrences hereinafter related. And far be it from us to infer that the appellant should have shot and killed the deceased at any time, and not handled the situation by due process of law. We were only stating a well known course of conduct usually followed in somewhat similar circumstances by people in general. Of course the killing of a person is never justifiable, but is excusable under the law of self-defense, the defense of one's family or his castle, etc., when all of the necessary elements of self-defense and of his family and castle are established. We mention this only so that we will not be misunderstood as suggesting condonement of the killing of a person under any circumstances.

So far as we are informed, the courts of this State have never heretofore been confronted with the issue whether the law of manslaughter should be charged and such issue submitted to the jury under the factual situation as disclosed

by the record in this case. It would seem, however, that if to slap one's face or spit on one's person or tweak one's nose, or rudely jostle one off the sidewalk, illustrations often given in the approved charges of trial Judges as sufficient to arouse such sudden heat of passion, as to make it an issue for the jury to decide whether such treatment sufficiently rebuts the presumption of malice arising from the use of a deadly weapon, then the mistreatments of the appellant's wife, and of the appellant, which mistreatments we will now summarize as briefly as it may well be done, would be even more efficacious.

In 1946, the appellant owned two small adjoining farms about three miles out of Conway in the "Savannah Bluff" section of Horry County. Having undertaken to farm that year, he made a failure, and that fall had to sell one of these two farms in order to pay his debts. He sold one place to Melvin Brown and leased the other farm to him, with the exception of the small dwelling thereon and an acre of land, the home site, where he and his wife and three small children resided. Under a share crop agreement between the deceased and Mr. Brown for the following year, the deceased, in November, 1946, commenced moving some of his possessions on the farm which Brown had purchased, but the family of the deceased were not moved there until later. After selling one of his farms and leasing the other, with the exception heretofore noted, the appellant secured employment with the paper mill at Georgetown where he stayed except on week ends when he would come home to his family. Having moved some corn into the barn on the farm on which he intended residing, Mr. Squires (the deceased) stopped by the home of the appellant ostensibly for the purpose of leaving there a key to the barn door, and while there inquired as to the whereabouts of the appellant, and when he would be home. Appellant's wife replied that her husband w o r k e d in Georgetown and only came home on week ends. Within three of four nights, Squires

returned to appellant's home in the absence of appellant, rapped on the door and when appellant's wife cracked the door to ascertain who was there, came inside, and announced his intention to spend the night with her. When she remonstrated in severe language, he slapped her three times and as she whirled to try and get away from him, he slapped her again causing her to fall over a rocking chair, hitting her head against it and causing her great pain and suffering. He then helped her from the floor where she had fallen, and to her bed in her room, and there by force and threats of further violence, had sexual intercourse with her. Upon leaving, Squires told appellant's wife that if she told his wife about what he had done, or told her husband, or "went to the law," he would kill her and her husband. When appellant returned home from his work in Georgetown, he found his wife in bed and inquired if she was sick. She testified that she didn't know whether to tell him what had occurred the first of the week, so replied, "I tell you what, if you will get a place and let's move out of this neighborhood, I will tell you what happened." Appellant then noticed that one side of her face, and the tip of her ear was blue, and insisted on first getting a doctor for her, but when she objected, finally procured some medicine from Dr. Holmes. Her ear commenced to hurt so in about two weeks, the appellant carried her to Dr. Brooks at Conway who, after examining the ear said (quoting from the testimony of appellant's wife), "It has got a right to hurt, because your ear drum is busted," and "You will have to go to Florence (to an ear specialist), there is nothing I can do for you." She made two trips to Florence where she is supposed to have received treatment, and when she returned home from the last trip at about sunset, she had to go to bed on account of the pain she was suffering from this ear. That night she told her husband (the appellant) the cause of her injury, and what had occurred. Appellant first carried his wife and children to the home of Mrs. G. W. Marlow, a relative, where they remained for

two days while he went to Georgetown, and then all of them returned to their home near Conway and appellant remained at home for about two weeks. He then commenced to again work in Georgetown. about the middle of January, 1947, Squires' wife went to Georgia on a visit, and the first night she was gone Squires came to the home of the appellant and knocked and called intermittently, first from the front door and then from the back door, but failed to gain entrance. The next night, he came again and after knocking and no one answering the door, broke in through the front door, and when appellant's wife was trying to escape through the back door, grabbed her, daring her to holler and pushed her down on a large table, spraining her back and otherwise rendered her unable to resist him, and again ravished her. Before leaving he warned her as to what he would do if she told his wife, or her husband, or appealed to the law. Upon the return of the appellant, two or three days thereafter, from his work in Georgetown, he found his wife in bed suffering from the sprain caused by being pushed over on and upon the table, and immediately inquired as to what had happened, and was informed. The appellant's wife and children were then carried back to Mrs. Marlow's where they remained while the appellant undertook to find a place in Georgetown to live. (The visits of appellant's wife and children at the home of Mrs. Marlow on the two occasions herein mentioned were corroborated by her.) When appellant could not procure a house in Georgetown, and his wife refusing to remain at home at night unless he was there, he then arranged to daily commute to his work, and thus be at home every night. Appellant was put on a swing shift at the paper mill in Georgetown which would have required that he be away from home some nights, so he took a job at a mill in Conway and his wife also got a job there and they worked together for about six or eight weeks, when the inference is that Squires caused the appellant's wife to be discharged. The appellant then built a trailer, and he and

his family moved to Georgetown and lived in it for a while at least, and appellant commenced to again work at the pulp or paper mill of Southern Craft. While living there, Squires (the deceased) made several attempts to see the wife of the appellant, and finally forcibly entered the trailer, and by force and putting her in fear of her life, sexually knew her, all of which she reported to the appellant. In addition to actual assaults and batteries committed on appellant's wife by Squires, he continuously tried to get in her presence throughout the entire time herein covered; and had actually gone into the home while the appellant was there, brandished a pistol and threatened their lives if they or either of them took any action against him or made the slightest move indicating intention to do him any bodily harm.

That the mistreatment of the appellant's wife by Squires is not a fabrication without any basis in fact, and made for the first time upon the trial of the appellant for the murder of Squires, is evidenced by the testimony of Sheriff Sasser of Horry County, and Sheriff Cribb of Georgetown County, besides other corroborating witnesses.

Despite all of this, the appellant entered into two business deals with Squires, first, in leasing to him his home near Conway, and second, then purchasing the lease from him, but this was a matter to be considered by the jury.

Appellant and his family moved back to their home near Conway and again Squires commenced to continuously go there in an effort to gain entrance to the house, but never succeeded, all of which was reported to the appellant by his wife.

On the day the appellant shot and killed the deceased, the appellant was not working, and was at his home trying to get some rest as he was suffering from malarial fever. In addition to this he was in a highly nervous state from the near to incredible (except for the corroborations) indignities his wife and he had suffered from Squires for a period of ap-

proximately two years. After eating a late meal, he went on his back porch to get a drink of water and saw Squires a short distance from his home loading some potatoes, but did not know he was going to stop in front of his house in leaving. He lay across a bed in a front room of his house and soon his wife came in and joined him. They commenced to talk, and appellant was so nervous and worried he broke down and cried, and about this time, an automobile horn started blowing in front of his home which is near the road, and some one was calling for Mrs. Martin. She rose up and looked out of the window, and exclaimed to her husband, "Emerson, that is that grand rascal again out there calling me." Squires had driven up in front of the Martin home in his pickup truck, and stopped as close to the front of the home as two cedar trees would permit, and was sitting in the driver's seat of the truck. Following the exclamation of his wife, the appellant jumped up from the bed, and saw Squires in the truck. Whereupon, the appellant in his highly nervous state of mind, grabbed his shot gun from a corner of the room and fired through the window in the direction of Squires, one of the shot (the shell in the gun was loaded with buckshot) striking Squires in his temple and penetrating his brain, causing his death.

The foregoing is merely a summary of the salient portions of the testimony in behalf of the appellant, but all of his contacts with the deceased have not been referred to. We must, however, consider this testimony in reaching a conclusion whether it produced a situation, or could reasonably have been expected to produce a situation where the appellant was entitled to have the law of manslaughter charged the jury, and such issue submitted.

As was stated by Mr. Justice Cothran in writing the opinion of the Court in State v. Cameron, 137 S. C. 371, 135 S. E. 364, 367: "It has been exceedingly difficult to lay hands upon a satisfactory definition of 'legal provocation.'" He then quoted from State v. Ferguson, supra.

While we are probably going farther than in any case heretofore decided by this Court, a deadly weapon having been used, yet, this case also probably has the most unusual factual background ever heretofore passed upon in this State in considering the refusal of the trial Judge to submit the issue of manslaughter to the jury in the trial of a homicide case. The record discloses that appellant was a craven, and that it was only on this one occasion that his great fear of Squires for his own safety, was sufficiently overcome by heat of passion to produce his drastic action. And where is the one man who can unerringly reach the conclusion that the taunting of the appellant and his wife by the deceased at the time and place he was shot and killed, viewed in the light of the great wrongs and indignities he had theretofore inflicted upon them, was not "the straw that broke the camel's back," and constituted provocation much more than comparable to one having his face slapped, or being spit upon, or having his nose tweaked, or being rudely jostled off a sidewalk? "Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard, the merchant, the mechanic, the farmer, the laborer; these sit together, consult, apply their separate experience (and observation) of the affairs of life to the facts proven, and draw a unanimous conclusion. The average judgment thus given it is the great effort of the law to obtain. It is assumed that twelve men know more of the common affairs of life than does one man; and they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge." *Sioux City & Pacific Ry. Co. v. Stout,* 17 Wall. 657, 84 U. S. 657, 21 L. Ed. 745-749.

The defendant-appellant is entitled to the benefit of every reasonable doubt, and there being a reasonable doubt as to whether the issue of guilty of manslaughter should have been submitted to the jury, we feel impelled to give him the

benefit of such doubt. Therefore, the exception charging error in this respect is sustained.

Reversed and remanded for a new trial.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.