16479

STATE v. GARDNER

(64 S. E. (2d) 130)

*Messrs. Francis G. Holliday, Jr.,* and *Charles W. McT eer,*
of Chester, *for Appellant,*

*Mr. W. Gist Finley, Solicitor,* of York, *for Respondent,*

March 19, 1951.

OXNER, Justice.

Appellant killed his wife about nine o'clock on Monday morning, March 6, 1950. He was indicted and arraigned during the March, 1950 term of Court of General Sessions for Chester County and two members of the Chester Bar were appointed to represent him. On motion of these attorneys, the Court ordered that appellant be examined by the staff of the South Carolina State Hospital. The authorities of that institution declared him sane. At the June, 1950, term of Court he was tried and found guilty of murder and sentenced to death by electrocution. The principal questions for determination on this appeal are whether the Court below erred in holding that there was no evidence of manslaughter and in failing to submit to the jury the defense of insanity. A determination of these questions necessitates a review of the testimony.

Appellant is twenty-five years of age and a man of limited intelligence and education. He and the deceased were married on October 10, 1948 and had one child. Their married life seems not to have been a happy one. Appellant says that she "didn't keep house", "wouldn't stay at home", and that her constant interference with his work made it impossible for him to keep a job. He first worked at a cotton mill near Chester and lived in the home of his wife's parents. During the latter part of 1948 he left the mill and secured a job at a filling station. He and his wife then moved to the home of his mother. Shortly thereafter his father-in-law had him arrested for "beating a board bill". He remained in jail for several days and the charge was withdrawn. After a short interim of unemployment, he worked for three or four months at another filling station near Chester operated by a Mr. Hogan, who testified: "I just had to let him go. His wife gave a lot of trouble. Had to run her away. He was kind of a nervous fellow, and she got him tore up and he couldn't work on a car and so I had to let the boy go. He just didn't have the mind to run his job. That is all. He couldn't do it." While working for Mr. Hogan, appellant states that he was "beaten" by his father-in-law.

Appellant next worked at a colored theater for several months when he says he was again discharged on account of the conduct of his wife. He claims that he was then unable to secure a job anywhere around Chester and during December, 1949, went to Statesville, North Carolina, and secured employment in a furniture factory. After working several days, he returned to Chester to get his wife and baby but was immediately arrested on a warrant for vagrancy issued at the instance of his mother-in-law. A week or two later another warrant was issued for non-support. After remaining in jail for several weeks, he was released on bond. This charge of non-support was pending when the Court of General Sessions convened on the morning of the homicide and the deceased had been instructed to come to the Court House for the purpose of going before the Grand Jury.

At the time of the homicide, appellant was living alone in a rooming house at Chester and his wife and baby were staying at the home of her parents at the Eureka Mill village. Appellant testified that he left his room about seven o'clock on the morning of the homicide and went to the Eureka Mill, where his father-in-law worked, for the purpose of inducing him to withdraw the non-support charge so that he (appellant) could leave Chester and secure employment; that he took with a him a butcher knife because his father-in-law had threatened to kill him; that being unable to find his father-in-law at the mill, he went to the house where he found his wife, her two young sisters, six and twelve years of age, and his baby; that he tried to get his wife to drop the non-support charge, but she refused to do so and asked her twelve year old sister to go to the home of a neighbor and call a taxi to take her to the court house. While the sister was away, appellant says that his wife stated that she and her father were going to put him in the penitenitary; that they "got into an argument"; that she "jumped on me" and "me and her got into it", but that he did not remember anything that occurred thereafter.

The twelve year old sister of the deceased testified that appellant came to the house about eight o'clock and tried to get his wife to go with him to the court house, stating that it would be unnecessary to get there until ten or eleven o'clock, but the deceased insisted that she was to be there at nine and asked her to go to a neighbor's house and call a taxi; that when she left, appellant and his wife did not seem to be mad and were "calling each other honey"; that after telephoning for a taxi, she returned and found her sister lying on the floor and, at the suggestion of appellant, called the officers. Two officers arrived within a few minutes. Immediately after they entered the house, appellant stated to them that he had just killed his wife with a butcher knife and was "ready to go and ready to be electrocuted". His wife was lying on the kitchen floor and died in a few minutes. The

handle of a butcher knife was found under a cabinet in the kitchen. One of these officers testified that when they arrived at the house, appellant was nervous and seemed not to be normal; that his mind "didn't act clear"; and that: "He just looked like a madman. He had a frown on his face. When we put him in the car, he throwed his head back on the seat and closed his eyes." This officer declined, however, to say that appellant was insane and testified that several hours later he appeared to be perfectly normal.

Shortly after noon on the day of the homicide, appellant signed a confession at the jail in which he stated that he went to the house for the purpose of killing his father-in-law but found he was not at home; that he and his wife got into an argument and he stabbed her; and that he had previously determined that if his wife did not withdraw the non-support warrant, he was going to kill her.

An examination of the body disclosed a brutal killing. There was a deep wound in the left side which cut the kidney and large blood vessels. The undertaker removed the blade of a butcher knife from this wound. There was also a deep wound in the upper abdomen below the breast bone and a deep wound in the left side of the chest. These two wounds appeared to have been made by an instrument about the size of scissor blades. There were several bruises and scratches "on the front of the throat". On the day after the homicide, one of the officers discovered a pair of bloodstained scissors on a cabinet in the kitchen where the deceased was found. The points seemed to have been freshly broken.

One of the physicians from the State Hospital testified that their examination and observation of appellant disclosed that he was "an emotionally tense" person, had the "intelligence of a borderline individual" and a "mental age—if you graded him—of approximately ten to eleven years", but it was the unanimous opinion of the three examining physicians that appellant "was not insane" and "knew right from wrong".

We shall first determine whether the Court below ■■ erred in failing to submit to the jury the offense of manslaughter. The rule is well established in this jurisdiction that on a trial for murder growing out of the use of a deadly weapon, it is unnecessary to charge the law relating to manslaughter where the testimony fails to suggest any theory upon which a verdict of manslaughter could rest. *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587; *State v. Bealin,* 201 S. C. 490, 23 S. E. (2d) 746; *State v. Takis,* 204 S. C. 140, 28 S. E. (2d) 679; *State v. Martin,* 216 S. C. 129, 57 S. E. (2d) 55. It is equally well settled that to warrant the Court in eliminating the offense of manslaughter, it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter. *State v. Norton,* 28 S. C. 572, 6 S. E. 820. Also, see *State v. Hughes,* 107 S. C. 429, 93 S. E. 5.

Voluntary manslaughter is usually defined as the unlawful killing of a human being in sudden heat of passion upon a sufficient legal provocation. In determining whether the act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing. While there is some evidence that appellant was in a fit of passion or frenzy at the time of the homicide, the difficult question is whether there is any evidence tending to show that such passion, if found to exist, was engendered by an adequate provocation. Our decisions are uniformly to the effect that where death is caused by the use of a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation. *State v. Levelle,* 34 S. C. 120, 13 S. E. 319; *State v. Davis,* 50 S. C. 405, 27 S. E. 905, 911; *State v. Gilliam,* 66 S. C. 419, 45 S. E. 6; *State v. Judge,* 208 S. C. 497, 38 S. E. (2d) 715. In *State v. Davis, supra,* the Court said: "It may be concluded, therefore, that 'the sudden

heat and passion, upon sufficient legal provocation,' which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an 'uncontrollable impulse to do violence'."

Assuming that appellant did not go to the home of his father-in-law with a formed purpose or design to kill his wife, a jury would still be warranted under the evidence in concluding that he assulted and stabbed her in a fit of anger because she refused to withdraw the charge of non-support. Under this view of the evidence, a sufficient legal provocation would be wholly lacking. But is this the only inference to be drawn from appellant's testimony? He says that his wife "jumped on me" and "me and her got into it". These expressions can reasonably be construed as meaning nothing more than that appellant's wife severely reprimanded or violently censured him, and that they became engaged in a heated argument. On the other hand, they might be subject to the construction that there was some overt, threatening act or a physical encounter. At least there is sufficient doubt thereabout, we think, to warrant submission to the jury of the question of manslaughter.

We now turn to the issue of insanity.

The preliminary question is raised that in view of the finding of the staff at the State Hospital that appellant had only a mental age of ten or eleven years, he was entitled to the same presumption of incapacity which is given to a child between the ages of seven and fourteen. But it has been uniformly held that this presumption refers to the physical age of a child and does not extend to a person above the age of fourteen. *Commonwealth v. Trippi,* 268 Mass. 227, 167 N. E. 354; *State of New Jersey v. Ehlers,* 98 N. J. L. 236, 119 A. 15, 25 A. L. R. 999; *State v. Haw-*

_kins,_ 121 S. C. 290, 114 S. E. 538, 27 A. L. R. 1083; _State v. Simmons,_ 208 S. C. 538, 38 S. E. (2d) 705; Annotation 44 A. L. R. 584. Criminal responsibility does not depend upon the mental age of the defendant, nor upon whether his mind is above or below that of the average or normal man. Subnormal mentality is not a defense to crime unless the accused is by reason thereof unable to distinguish between right and wrong with respect to the particular act in question. "Under the law of this state, the test is mental capacity or the want of it sufficient to distinguish moral or legal right from moral or legal wrong, and to recognize the particular act charged as morally or legally wrong." _State v. Jackson,_ 87 S. C. 407, 69 S. E. 883, 886. Also, see _State v. McGill,_ 191 S. C. 1, 3 S. E. (2d) 257.

We are unable to discover any evidence in this case which can reasonably be said to rebut the presumption of sanity. Although there is a showing of low mentality and some emotional instability, there is no evidence whatsoever that appellant was unable to distingush between right and wrong or to recognize the nature and quality of the act committed. His testimony that he doesn't remember assaulting and killing his wife, standing alone, is insufficient to establish insanity. _State v. Coyle,_ 86 S. C. 81, 67 S. E. 24. Otherwise, any defendant could always raise the issue of insanity by simulating loss of memory. His appearance and actions immediately after the homicide, as described by one of the officers, are insufficient to justify a plea of insanity. The uncontradicted evidence is that appellant was prefectly normal and composed just prior to the homicide and his statement immediately thereafter that he had killed his wife and was "ready to be electrocuted" shows that he fully appreciated the gravity of his act. The fact that he may have killed his wife while in a fit of passion does not show an insane mind. It must be remembered that we have never accepted in this State the doctrine of uncontrollable impulse. _State v. Gilstrap,_ 205 S. C. 412, 32 S. E. (2d) 163, and

cases therein cited. In the main we are in accord with the following statement made by the Court of Criminal Appeals of Texas in *Anderson v. State,* 67 Tex. Cr. R. 320, 148 S. W. 802, 804: "We cannot sanction the doctrine that one who, prior to the time and subsequent to the time of committing an act, shows no symptoms of insanity or weakened intellect, can raise the question of insanity as a juistification of crime by showing that he was not in a normal state of mind, was angry, looked wild, and acted different than he did ordinarily for the brief period of time necessary to the consummation of the act. Such doctrine would render virtually all homicides justifiable, for there are but few instances where one slays another while his mind is in normal condition."

We do not undertake to foreclose appellant from entering a plea of insanity on another trial. There then may be additional evidence which, when considered in connection with circumstances herein mentioned, will be sufficient to justify such a plea. We only hold that on the record now before us, there was no error in failing to submit to the jury the question of insanity.

It is contended that the Court erred in admitting in evidence the statement or confession signed by appellant about four hours after the homicide. We think the statement was admissible. However, the Court below failed to give any instructions whatsoever as to the rules governing confessions. We think this was prejudicial error. *State v. Scott,* 209 S. C. 61, 38 S. E. (2d) 902. The question of whether appellant understood the contents of this statement and freely and voluntarily executed it should have been submitted to the jury under appropriate instructions.

The only other questions raised by the exceptions relates to a matter that will not likely arise on another trial and need not be determined.

Before concluding this opinion, we think it should be stated in fairness to the trial Judge that he was neither requested to charge the law of manslaughter nor re-

quested to instruct the jury on the subject of confessions. There was also no suggestion during the trial that the Court charge on the law of insanity. But under the well recognized practice of this Court where the death penalty is involved, these omissions on the part of counsel will not be held to waive appellant's rights.

We wish to take this opportunity of acknowledging our appreciation of the services rendered without compensation by counsel for appellant. They have conscientiously and ably discharged their duties.

Judgment reversed and the case is remanded for a new trial.

TAYLOR, J., and L. D. LIDE, Acting Associate Justice, concur.

FISHBURNE and STUKES, JJ., dissent.

STUKES, Justice (dissenting).

It is with sincere regret that I have reached the considered conclusion that it is my duty to dissent from the opinion of the majority of the court in this case, and I shall briefly state my reasons.

In the first place, the able and conscientious counsel (this is the characterization of them in the majority opinion and there is no disagreement thereto) who had months to prepare the defense, expressly stated to the court at the trial, in effect, that there was no evidence which warranted a charge upon the law of manslaughter. Nevertheless, I have searched the record in vain for such. Fragmentary expressions from appellant's testimony are quoted in the majority opinion in effort to raise the inference of physical threat or encounter preceding his use of the butcher knife. I quote his direct evidence thereabout:

"Q. All right, now what took place when you got to the house? A. Well, nothing. I just sat down there and played with the baby. All of them had gone to school except Audrey.

Nobody but me.and my wife and the baby, and I was sitting there and playing with the baby about 15 or 20 minutes and she came in there and jumped on me. Said, 'if you get out here and get you a job and go to work none of this stuff would take place,' and she said, 'Me and my daddy are going to put you in the penitentiary before it is all over with you.'

"Q. Do you remember what happened after that? A. No sir, not a thing. Me and her got into it. That is all I remember."

On cross-examination he said: "Me and her got into an argument and that is everything that I remember. The next thing I knew she was lying on the floor dead." I think there is no need to add comment on the foregoing. It speaks loudly for itself.

Further light is thrown upon the nature of the deed by the report of the postmortem medical examination of the victim, in evidence, as follows: "This is to certify that I examined the dead body of Mrs. Ophelia Gardner at Lawrence Funeral Home, Chester, S. C., on March 6, 1950. There was a deep wound left side running backward below last rib. This wound was about four inches long and cut the kidney and large blood vessels. It was done with some sharp cutting instrument as large knife. There was a deep wound in the upper abdomen below the breast bone. It was about three fourth inch long and entered the stomach. There was a deep wound in left side of chest one inch from the center of the breast bone at about the fifth rib. This wound was about three fourth inch long, and entered the lung and blood vessels. This and the wound in the abdomen were caused by some sharp instrument. There were several bruises and scratches on the front of the throat that could have been caused by choking. Examination showed that she was about two months pregnant. Death was due to the above wounds."

It is well settled that the law of manslaughter should not be charged in a trial upon an indictment for murder when there is no evidence or inference of fact to support a verdict

of manslaughter. Decisions so holding are cited in the majority opinion. A valuable authority on the general subject is *State v. Jones,* 133 S. C. 167, 130 S. E. 747. It cites with approval the old case of *State v. Kirkland,* 14 Rich. 230, where the following rule was quoted from Archbold's Crim. Pl. & Pr., 918: "But the court. in charging the jury on a trial for murder, cannot be required to suppose a state of facts of which there is no evidence." This is the rule generally in other jurisdictions. 26 Am. 544, Homicide, sec. 544. 41 C. J. S., Homicide, § 395, pp. 214, 216, Manslaughter (a) captioned as follows: "An instruction on manslaughter is warranted where, and only where, an issue thereon is properly raised by the evidence."

The statement or confession of the appellant, which was made several hours after the homicide when calm had followed the storm, was as follows: "I left home around 6:30 a. m., March 6, this morning. Then I stopped at Baker's Service Station for about an hour. When I left there I went to Eureka Mills and stayed there until about 7:45 a. m. I then went down to Mr. Danyels' home to see him. When I got there they told me he had gone to town. (Audrey told me). I stayed there until about 8:30 waiting on Mr. Danyels. I went there with intentions of killing Mr. Danyels. Me and my wife got into it then. She started to accusing me of running with women. I then grabbed her and stabbed her with a knife. I had taken the knife that I used from my room on Hinton St. I made up my mind about three weeks ago that if she did not withdraw the warrant she had out for me that I would kill her. When I left home this morning I left with the intentions of killing my wife. I have had lots of trouble with my wife and her people. I could not hold a job for her. Another thing she would not do she would not keep house. I am not sorry for the murder that I committed, and have no apologies to make to anyone."

It is said in the majority opinion that the statement was admissible, with which I fully agree. How then can it be said that it was necessary that instructions be given the jury

with respect to the law governing the admissibility in evidence of confessions? It seems to me that any question is answered by the conclusion that the statement was admissible. It was properly admitted without the necessity of instruction to the jury that they should consider it only if they found that it was freely and voluntarily given because all the evidence and inferences showed that it was so given. There is not the slightest evidence, even in appellant's testimony, of any improper or questionable means to obtain it. The authority of the cited case of *State v. Scott,* 209 S. C. 61, 38 S. E. (2d) 902, is therefore entirely inapplicable. In that case there was evidence (from appellant) of duress, beating, etc.; but none here.

Certainly the majority opinion is in error when it discounts appellant's attempted reliance upon the defense of insanity. Appellant called as his witness the neuropsychiatrist who, with his staff of two other physicians of the State Hospital, had appellant under observation (on defense counsel's motion) for a period of thirty days during the interval between the homicide and the trial, to determine his sanity. The testimony of this defense witness is quoted from in the opinion of the majority. Appellant's loss of memory of details of his deeds, to which he testified, appears to have been in patent effort to bolster this, his only defense. One of the exceptions presented in this court, and briefed and argued by counsel, imputes error to the trial court in failing to charge, quoting from the exception, "the law of temporary insanity." Insanity was, indeed, the only possible defense under the stark facts portrayed by the evidence. I am in full agreement with the able discussion of the law of defense by reason of insanity, which is contained in the majority opinion.

There is no doubt in my mind that justice and unbroken precedent require affirmance. I therefore respectfully dissent from the judgment of reversal.

FISHBURNE, J., concurs.