23388

The STATE, Respondent v. Mitchell Carlton SIMS, Appellant.

(405 S.E. (2d) 377)

Supreme Court

*Assistant Appellate Defender Joseph L. Savitz, III, of S.C. Office of Appellate Defense,* Columbia, *for appellant.*

*Attorney General T. Travis Medlock, Asst. Attys. Gen., Harold M. Coombs, Jr.,* and *Amie L. Clifford,* Columbia, *and Sol. Charles M. Condon,* Charleston, *for respondent.*

Heard Sept. 24, 1990; Decided May 6, 1991.

Rehearing Denied July 1, 1991.

HARWELL, Justice:

In the first phase of a bifurcated capital trial, appellant Mitchell Carlton Sims (Sims), was found guilty of murdering two Domino's Pizza employees during the commission of an armed robbery. At the end of the second phase, the jury recommended the death sentence for each murder conviction. We affirm the convictions and the sentences.

## FACTS

In May, 1985, Sims was unhappy with his supervisor and resigned from his position as store manager of the West Columbia Domino's Pizza. In mid-November of 1985, Sims and his girlfriend moved to Charleston. Sims obtained a part-time job as a driver at the Domino's in Hanahan, as well as a second job at a carpet cleaning service. Despite this, Sims began having financial problems, and when his truck broke down in late November, he borrowed money from a co-worker to have it repaired. On December 1, 1985, Sims' truck broke down again. Sims was unable to afford to have it repaired, so he informed Domino's that he could not deliver pizzas. Sometime after midnight on December 3, Sims walked from his trailer to the Domino's in Hanahan. Sims tied up the two employees

who were working, shot them, and robbed the store. Sims then walked home. One of the employees died immediately, but the other employee made his way to the police station and informed police that Sims had committed the crimes. The employee died a few days later. Sims and his girlfriend fled to Florida, to California, and then to Nevada where they were eventually apprehended.

## DISCUSSION

### I. PRETRIAL ISSUES

At a pre-trial hearing on March 13, 1989, Sims motioned that the charges against him be dismissed for several reasons including that there had been a breach of attorney-client confidentiality. Sims stated that a detective working for the State came to his cell to speak with him and disclosed information that Sims had only shared with his attorneys. At this time, Sims did not ask that counsel be dismissed. The trial judge told Sims that they would discuss the matter in further detail at a later date. At another pre-trial hearing on April 28, 1989, ten days before the trial began, Sims requested that the Public Defender's Office be dismissed from his case because he was uncomfortable with the knowledge that someone from that office had leaked confidential information, and felt that his best interests were not being represented. The trial judge denied Sims' request. On appeal Sims argues that the trial judge erred in denying his request to dismiss counsel, and in not offering him the opportunity to proceed *pro se*. We disagree.

The question of whether court appointed counsel should be discharged is a matter addressed to the discretion of the trial judge. Only in a case of abuse of discretion will this Court interfere. *State v. Marshall*, 273 S.C. 552, 257 S.E. (2d) 740 (1979); *State v. Hyman*, 276 S.C. 559, 281 S.E. (2d) 209 (1981). In evaluating whether the trial judge abused his discretion in denying Sims' motion for substitution of counsel, the Court may consider several factors: timeliness of the motion, adequacy of the trial judge's inquiry into the defendant's complaint, and whether the attorney-client conflict was so great that it resulted in a total lack of communication, thereby preventing an adequate defense. *U.S. v. Gallop*, 838 F. (2d) 105 (4th Cir. 1988).

While Sims brought the incident to the trial judge's attention on March 13, he did not request that counsel be dismissed until April 28, ten days prior to trial. The trial judge is entitled to take into account the countervailing state interest in proceeding on schedule. *U.S. v. Gallop*, 838 F. (2d) at 108. If granted, Sims' motion may not have allowed substitute counsel adequate time to prepare and could have caused further delay.

The record indicates that the trial judge adequately inquired into Sims' complaint. The trial judge held a hearing in chambers with Sims, and his counsel and Sims was permitted to fully explain the content of the confidential information that he felt had been leaked: that his wife was pregnant, that he had a problem with alcohol, and that his defense strategy would be to concentrate on the penalty phase.

Finally, while Sims indicated he was uncomfortable with the knowledge of the breach, there is no evidence that Sims' apprehension led to any conflict or lack of communication with his counsel. We conclude the evidence was insufficient to justify substitution of counsel and the trial judge acted properly in denying Sims' motion.

Sims also argues that the trial judge erred in not allowing him to proceed *pro se*. We disagree. The right to appear *pro se* must be clearly asserted by the defendant before trial. *U.S. v. Lorick*, 753 F. (2d) 1295 (4th Cir. 1985); *State v. Marshall*, 273 S.C. 552, 257 S.E. (2d) 740 (1979). Here, Sims gave no indication of a desire to proceed *pro se* prior to trial. This contention is without merit.

## II. VOIR DIRE ISSUE

Sims contends that the trial judge erred during the voir dire examination of five of the jurors by informing them that Sims would "go home" if they found him not guilty. The trial judge made this statement while explaining the nature of a bifurcated trial. He explained to the jurors that:

> A capital murder trial is divided into two phases. The first phase being the guilt phase. If the defendant is found not guilty, the trial comes to an end. The defendant goes home. The jurors go home. But if the defendant is found

guilty, then we go to the second phase of the trial called the punishment phase.

We conclude that a reasonable juror would have clearly understood the trial judge's remarks as an explanation of a capital trial rather than a comment on what would become of Sims upon conviction or acquittal. *See State v. Jackson*, 297 S.C. 523, 527, 377 S.E. (2d) 570, 572 (1989) (test is what a reasonable juror would understand the charge as meaning).

## III. GUILT PHASE ISSUES

### A. ADMISSIBILITY OF SIMS' STATEMENT OF DECEMBER 26, 1985

Sims argues that the statement he made on December 26, 1985 was inadmissible because it was made after he invoked his right to counsel and during interrogation initiated by the police. Sims was arrested on December 25, 1985 in Las Vegas. Later that day, two officers from California, Officers Perkins and Montecuollo, came to question Sims. Sims was a suspect in a Domino's murder and armed robbery in California. The officers advised Sims of his rights; and Sims indicated that he wished to remain silent and wanted an attorney. The officers then ceased the interrogation and informed Sims that he would have to initiate any future contact between them. The next day, Sergeant Anderson visited Sims to ask him if he wanted to sign a form waiving extradition. Sims stated that he did not and requested to see the officers from California. After a general discussion with the officers, Sims agreed to waive his rights and go "on the record" and discuss the South Carolina crimes. Sims then gave a statement incriminating himself in these crimes. The trial judge allowed the statement into evidence finding that Sims initiated the contact with the police and that he freely and voluntarily made the statement. We agree.

Once an accused requests counsel, police interrogation must cease unless the accused himself "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 1885, 68 L. Ed. (2d) 378, 386 (1981). Sims argues that Sergeant Anderson initiated the interrogation on December 26 when he asked Sims whether he wanted to waive extradition. We disagree. Inter-

rogation is defined as express questioning, or its functional equivalent which includes "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-1690, 64 L. Ed. (2d) 297, 308 (1980). Sergeant Anderson's question concerning extradition was related to routine administrative processing and clearly was not an attempt to elicit an incriminating response from Sims. *See, e.g., South Dakota v. Neville*, 459 U.S. 553, 564, n. 15, 103 S. Ct. 916, 923, n. 15, 74 L. Ed. (2d) 748, 759 (1983) (holding that police inquiry whether suspect would submit to blood-alcohol test was not interrogation). Therefore, when Sims told Anderson he wanted to see the California officers, he initiated the contact. Sims admitted this is in the interview that day:

> Officer Perkins: . . . You have called us to talk to you is that correct?
>
> Sims: Correct.
>
> Officer Perkins: O.K., we didn't ask to talk to you?
>
> Sims: Correct.

The record also indicates that it was Sims, not the officers, who asked questions and made statements which "open[ed] up a more generalized discussion relating . . . to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S. Ct. 2830, 2835, 77 L. Ed. (2d) 405, 412 (1983). At the beginning of the conversation the officers and Sims were discussing unrelated topics, and Sims announced: "I'm not a murderer . . . I just got drunk . . . I knew I was doing it, but I shouldn't of done it. . . ." Sims then questioned the officers about extradition, and agreed to talk to the officers about his girlfriend's involvement in the South Carolina crimes in order to clarify which state she would go to. Thus, the record shows that Sims, rather than the officers, initiated the contact as well as the discussion of the investigation.

In addition to initiating the conversation subsequent to requesting counsel, the State also must prove a valid waiver of the Fifth Amendment rights to remain silent

and to have counsel present during interrogation. *Id.* Sims verbally acknowledged he was freely and voluntarily waiving his rights and he signed a written waiver of rights form. From the record before us, we conclude that the trial judge did not abuse his discretion in determining that Sims' statement was voluntary. *State v. Childs*, 299 S.C. 471, 385 S.E. (2d) 839 (1989). We find no violation of Sims' rights and thus conclude that the statement was properly admitted into evidence.

## B. ADMISSIBILITY OF DOMINO'S CORPORATE POLICY REGARDING ARMED ROBBERY

Sims argues that the trial judge should not have allowed the testimony of his former supervisor at Domino's as to Domino's corporate policy of cooperating with armed robbers. We disagree. A trial judge has considerable latitude in ruling on the admissibility of evidence and his rulings will not be disturbed absent a showing of probable prejudice. *State v. Sosebee*, 284 S.C. 411, 326 S.E. (2d) 654 (1985); *State v. Sullivan*, 277 S.C. 35, 282 S.E. (2d) 838 (1981).

Evidence which assists a jury at arriving at the truth of an issue is relevant and admissible unless otherwise incompetent. *State v. Schmidt*, 288 S.C. 301, 342 S.E. (2d) 401 (1986). Further, evidence is deemed relevant if it tends to establish or to make more or less probable some matter in issue upon which it directly or indirectly bears. *Id.*

Here, the testimony of Domino's corporate policy was relevant as it concerned Sims' knowledge of Domino's policy of complying with armed robbers. Sims' familiarity with Domino's policy revealed his motive for robbing Domino's, rather than somewhere else. Contrary to Sims' contention, there is clearly a connection between this evidence and the crime charged. The trial judge did not abuse his discretion and this evidence was properly admitted in both phases of the trial.

## C. ADMISSIBILITY OF GUN AND AMMUNITION FOUND IN SIMS' MOTEL ROOM AT TIME OF ARREST

Sims argues that the trial judge should have suppressed a gun and ammunition found in his motel room at the time of his arrest because they were seized as the result of a warrantless arrest. We disagree. The arresting

officer did not make a warrantless arrest; the officer testified that he was aware of the Federal Bureau of Investigation warrant, and of a warrant in California that had been issued for Sims' arrest. In addition, there were warrants for Sims' arrest in South Carolina. Since the officers were acting pursuant to valid arrest warrants which had been issued for Sims, they were authorized to enter the motel room to make the arrest. *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. (2d) 639 (1980).

The record also reveals that the discovery of the gun and ammunition were not the result of a search. After advising Sims of his rights, one of the officers asked Sims where the weapons were, and Sims voluntarily disclosed the location of the gun. However, the officer did not seize the gun until later that day, after he obtained a search warrant. The officer located the ammunition when Sims asked him to retrieve his money from the bureau. These items were clearly not seized as the result of an unlawful, warrantless arrest. We find no violation of Sims' Fourth Amendment rights as there was not a warrantless search or seizure.

## IV. SENTENCING PHASE ISSUES

### A. ADMISSIBILITY OF SIMS' CONVICTION OF UNLAWFUL POSSESSION OF A WEAPON AND THE SURROUNDING CIRCUMSTANCES

Sims argues that the trial judge should not have allowed evidence of his uncounseled guilty plea to unlawful possession of a weapon and certain hearsay testimony surrounding the incident. During the sentencing phase, the State published a stipulation that Sims had been convicted of the unlawful carrying of a pistol. The State then called the officer who arrested Sims to the stand. The officer testified that when he arrived at the scene, a woman met him and said: "He has a gun," and "He's going to kill my sister." The officer further testified that as he approached Sims, Sims reached toward his pocket, and the officer had to forcibly restrain Sims' hand while he retrieved a gun from Sims' pocket. Sims claims that the officer's testimony concerning the statements made to him by the woman should have been excluded as hearsay. We disagree.

Evidence is not hearsay unless it is offered to show the truth of the matter asserted. *State v. Griffin,* 277 S.C. 193, 285 S.E. (2d) 631 (1981). Here, the officer's testimony was not hearsay as it was not offered to prove that Sims intended to kill the woman in question. Rather, the evidence was offered to explain the officer's actions in restraining Sims when he reached towards his pocket. The evidence was not hearsay and was properly admissible.

Even if this Court were to find the statement was hearsay, it was still properly admitted under the *res gestae* or excited utterance exception to the hearsay rule. The officer proceeded directly to the scene upon being dispatched there. The officer testified that the woman who approached him and made the statements was upset. Her statements were therefore a part of the *res gestae* and were admissible. *State v. Harrison,* 298 S.C. 333, 380 S.E. (2d) 818 (1989).

Sims also objects to the introduction of this evidence because he was not represented by counsel when he pled guilty. In *Baldasar v. Illinois,* 446 U.S. 222, 100 S. Ct. 1585, 64 L. Ed. (2d) 169 (1980), the Supreme Court held that a prior uncounseled conviction could not be used to enhance punishment for a subsequent offense. However, Sims' conviction of unlawfully carrying a weapon was not utilized to enhance punishment. This evidence was not used by the State to obtain the death penalty. In fact, the jury was specifically instructed that this conviction could not be considered as an aggravating circumstance in support of the death sentence. Sims' uncounseled guilty plea was not utilized in the manner prohibited by *Baldasar,* and therefore was properly admissible. *See also State v. Canady,* — S.C. —, 391 S.E. (2d) 248 (1990). Further, regardless of the purpose for which the guilty plea was introduced, Sims' plea was uncounseled because he waived his right to counsel.

## B. ADMISSIBILITY OF SIMS' STATEMENT OF DECEMBER 25, 1985

Sims objects to the admission of a statement he made on December 25, 1985. On December 25, 1985, two officers from California went to the jail to attempt to get a statement from Sims. Sims refused to discuss the case with the officers. One officer then reads Sims his rights and Sims

refused to waive them. As the officers began to leave, Sims questioned them as to what would happen to him. The officer explained to Sims that he was wanted in South Carolina for two counts of murder and in California for the murder of a Domino's delivery boy. At that point, Sims blurted out: "I had to kill that boy," and "I didn't want him to identify me." Sims now argues that this statement was inadmissible because it was made after he invoked his rights to remain silent and to counsel.

Once a defendant invokes his rights, interrogation must cease unless the accused initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. (2d) 378 (1981). By asking the officers what would happen to him, Sims clearly initiated the conversation. *See Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. (2d) 405 (1983) (defendant asked this question, and was held to have initiated the conversation). There was no interrogation at all on the part of the officer, he merely responded to Sims' question, and before he could finish, Sims blurted out the admission. As stated in *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630, 16 L. Ed. (2d) 694, 726 (1966): "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Sims' statement of December 25, 1985 was properly admitted during the penalty phase of his trial.

## C. INSTRUCTIONS TO JURY THAT SENTENCING DECISION WAS A RECOMMENDATION

Sims asserts that the trial judge erred in instructing the jury that its sentencing decision was a "recommendation," in violation of our admonition in *State v. Bellamy*, 293 S.C. 103, 359 S.E. (2d) 63 (1987) (court admonished that the trial judge must convey to the jury the idea that its sentencing decision will be followed). Sims argues that the term "recommendation" erroneously suggested to the jury that its sentencing decision was advisory rather than binding on the trial judge.

The trial judge clearly explained to all prospective jurors that "whatever you recommend, will be the sentence that will be given to a defendant." In *State v. Middleton*, 295 S.C. 318,

368 S.E. (2d) 457 (1988), a similar instruction given to potential jurors was held sufficient to satisfy the *Bellamy* requirement. The entire record reveals that the jury was adequately informed that it was to make the ultimate decision as to Sims' fate. We find no error.

## D. INSTRUCTIONS TO JURY REGARDING MITIGATING CIRCUMSTANCES

Sims argues that the trial judge incorrectly instructed the jury that mitigating circumstances must reduce the degree of guilt. Sims contends that this instruction precluded the jury from considering mitigating factors such as his background and character.

Jury instructions must be considered as a whole and if as a whole, they are free from error, any isolated portions which might be misleading do not constitute reversible error. *State v. Jackson,* 297 S.C. 523, 377 S.E. (2d) 570 (1989). We have reviewed the instructions given by the trial judge and find that the jury was clearly instructed it could consider any mitigating evidence presented. In addition to the words Sims contests, the trial judge also instructed the jury that mitigating circumstances are "extenuating" circumstances, and that they reduce "the degree of moral culpability." The jury was instructed to consider evidence of Sims' background and character in mitigation in deciding which sentence to impose. It is simply implausible that a reasonable likelihood exists that the jury interpreted the instruction as precluding consideration of evidence in mitigation. *See Boyde v. California,* 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. (2d) 316 (1990). This contention is without merit.

## E. INSTRUCTIONS TO JURY REGARDING STATUTORY MITIGATING CIRCUMSTANCES

Sims contends that the trial judge erred in refusing to instruct the jury that he had "no significant history of prior criminal conviction involving the use of violence against another person," pursuant to S.C. Code Ann. § 16-3-20(C)(b)(1) (Supp. 1989). Although a request for this charge was not made at trial, the trial judge has a duty to review all statutory mitigating circumstances and instruct the jury as to any which may be supported by the evidence and not merely

those requested by the defendant. *State v. Bellamy*, 293 S.C. 103, 359 S.E. (2d) 63 (1987); S. C. Code Ann. § 16-3-20(C) (Supp. 1989). In deciding whether a statutory mitigating circumstance is supported by the evidence, the trial judge is concerned only with the existence of evidence and not its weight. *State v. Bellamy*, 293 S.C. 103, 359 S.E. (2d) 63.

The issue of whether Sims was entitled to have this mitigating factor submitted to the jury turns on an interpretation of the language in the statute. Sims contends that he was entitled to the charge in question because at the time he committed the crimes in South Carolina, he had no significant history of prior criminal convictions involving the use of violence against another person, as he committed the crimes in California, and was convicted of them, after he committed the crimes in South Carolina. We find this argument unpersuasive. We interpret the word "prior" for purposes of determining whether a defendant has no significant history of prior criminal convictions, to mean prior to the trial, rather than prior to the time of the crime.

In construing a statute, words must be given their plain and ordinary meaning without resort to subtle or forced construction in an attempt to expand the statute. *Bryant v. City of Charleston*, 295 S.C. 408, 368 S.E. (2d) 899 (1988). The legislature framed this mitigating circumstance in the present tense. The language states that "the defendant *has* no significant history . . ." (emphasis added). The clear meaning of the language is that at the present time, the defendant has no significant history of prior criminal convictions. If this was not the legislature's intent, it would have included the phrase "at the time of the crime," as they did in several of the other statutory mitigating circumstances. *See* S.C. Code Ann. § 16-3-20(C)(b)(7) and (9) (Supp. 1989) (age or mentality of the defendant *at the time of the crime*, and defendant was below the age of eighteen *at the time of the crime*).

This interpretation is in accord with a recent decision in Pennsylvania, in which the almost identical mitigating circumstance was interpreted to mean that whether a defendant has a history of prior criminal convictions must be evaluated as of the time of the sentencing hearing. *See Commonwealth v. Haag*, 522 Pa. 388, 562 A. (2d) 289 (1989). The trial judge was required to consider Sims' convictions in California, and thus

did not err in failing to submit this mitigating circumstance to the jury.

## V. PROPORTIONALITY REVIEW

Our review of the record convinces us that the death sentences were not the result of passion, prejudice, or other arbitrary factor, and that the jury's finding of aggravating circumstances is supported by the evidence. *See* S.C. Code § 16-3-25 (1976). The death penalty here is not excessive or disproportionate to the penalty imposed in similar capital cases. *See State v. Patterson*, 285 S.C. 5, 327 S.E. (2d) 650 (1984). The convictions and sentences are accordingly

Affirmed.

GREGORY, C.J., and CHANDLER, FINNEY and TOAL, JJ., concur.