535 S.E.2d 420

**The STATE, Respondent,**

v.

**Jimmy Clifton LOCKLAIR, Appellant.**

**No. 25161.**

Supreme Court of South Carolina.

Heard April 4, 2000.
Decided June 26, 2000.
Rehearing Denied Aug. 11, 2000.

354

Assistant Appellate Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, of Columbia, and Andrew J. Johnston, of Spartanburg, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General G. Robert DeLoach, III, all of Columbia, and Solicitor Holman C. Gossett, Jr., of Spartanburg, for respondent.

TOAL, Chief Justice:

Jimmy Clifton Locklair ("Locklair") seeks a reversal of his conviction and death sentence for the murder of Tammy Bridges ("Bridges"). We affirm Locklair's conviction and sentence.

### FACTUAL/PROCEDURAL BACKGROUND

This case involved a fatal love triangle between Locklair, Bridges, and Bridges' estranged husband Christopher Jones ("Jones"). While Locklair and Bridges were dating, Jones decided he wanted to reconcile with Bridges. His attempt at reconciliation led to a fatal altercation between Locklair and Jones. Locklair shot Jones three times in a church parking lot and was indicted for Jones' murder on June 5, 1995 and convicted on June 14, 1995. Bridges decided to move in with Locklair after he murdered her husband. While Locklair was free on a $50,000 bond for Jones' death, he shot and killed Bridges after she decided to move out of his home.

On April 16, 1995, the day of the fatal incident, Locklair's mother called Allen Nichols ("Nichols"), a close friend of Locklair's, because she was concerned that Locklair may attempt to kill himself. Locklair's mother warned Nichols to keep Locklair away from guns. Despite these warnings, Nichols decided to go target practicing with his .22 caliber rifle and his Beretta pistol with Locklair later that afternoon. Nichols and Locklair drove to Woodruff, South Carolina to shoot wild turkeys, but the flock got away.

As they were leaving Woodruff, Locklair asked Nichols to drive by Bridges' parents' house so he could return Jones' death certificate and Bridges' social security card to her. Nichols knew that Locklair had recently broken up with Bridges and warned him not to argue with her. When they arrived at the house, Locklair attempted to call Bridges on Nichols' cell phone but it would not work. Locklair reached over and started honking the truck's horn to get Bridges' attention. Bridges and her mother, Betty Williams ("Williams"), walked out to Nichols' car. Bridges asked Locklair what was wrong and asked why he had cut up her clothes. According to Nichols, Locklair told Bridges he was sorry and pleaded with her to talk to him. Bridges refused to talk to

Locklair and said "no Jimmy, I'm not coming back to you." As Nichols shifted gears to prepare to leave, Locklair reached into the glove compartment and grabbed the Beretta pistol.

Nichols attempted to grab Locklair's shirt collar and Locklair pulled him out of the truck. Bridges and Williams screamed and began to run away. Nichols testified that he saw Locklair taking long strides towards Bridges and he heard Locklair pulling the trigger of the pistol repeatedly, but the safety was on. As Nichols attempted to make a running tackle, Locklair disengaged the safety and shot Bridges in the back. Nichols said he tackled Locklair after the first shot but Locklair fired two more times before they fell to the ground. The gun then struck the asphalt and fired an additional round before jamming. Locklair then stood up and told Nichols, "leave me the f * * * alone, I got to do this."

Locklair stood up after Nichols tackled him and stepped over the victim's body before walking towards the William's home. Another witness, Robert Williams, the victim's stepfather, testified that Locklair looked "like he was hunting somebody." Locklair pointed the gun at the house and attempted to fire, but the gun jammed. Nichols tackled Locklair again while he tried to fire at the house. Meanwhile, Robert Williams left the car where he was observing and ran toward Locklair and Nichols. Robert Williams grabbed the gun and wrestled with Locklair over it. He eventually dislodged the gun and it fell on the ground, discharging once. Locklair pushed Nichols aside and ran toward a neighbor's house. Locklair went twenty or thirty feet, looked back once, then ran down the street. Robert Williams attempted to shoot Locklair but the gun jammed again and did not fire.

The Woodruff Police Department issued a bulletin from the Spartanburg County Sheriff's office concerning Locklair. The search continued until 4:00 a.m. the following day, when Locklair was found at his parents' home five miles from the scene. At the police station, Locklair voluntarily waived his rights, gave a tape recorded statement, and signed a hand written confession.

On the day before the murder, Bridges stayed the night with her sister, Stacy Waddell ("Waddell"). Locklair came to Waddell's house early in the morning to speak to Bridges.

When Locklair went back to Bridges' bedroom he was carrying an eight inch butcher knife. Waddell demanded the weapon and Locklair gave her the knife. Waddell gave the knife to William Earl Jennings ("Jennings") who had come to take Locklair home. Jennings testified that Locklair flung the knife out of the window as they drove home and said "you can't do anything with a knife."

Later that day, Waddell took Bridges to Locklair's home to pick up some of her clothes and personal items. Locklair had shredded all of Bridges' clothes and pictures. Waddell also testified that some of Bridges' identification was missing.

On the day of the fatal incident, Leslie Taylor ("Taylor"), a co-worker of Bridges, testified that a man called to speak to Bridges and told Taylor that "if something doesn't happen, someone is going to die." Taylor asked her supervisor to speak to the caller. Her supervisor identified the caller as Locklair. According to the supervisor, Locklair said if she did not let him speak to Bridges "someone was going to be killed." The supervisor told Locklair that Bridges was not there and he became angry and hung up the phone.

On May 18, 1995, the Spartanburg County Grand Jury indicted Locklair for murder and possession of a firearm during the commission of a violent crime. The State served its notice of intent to seek the death penalty on September 3, 1996. The jury found Locklair guilty as charged on September 19, 1998. On September 20, 1998, the trial judge presented the following aggravating circumstances for the jury's consideration at the conclusion of the penalty phase:

1. The Appellant had a previous conviction of murder.

2. The Appellant knowingly created a great risk of danger to more than one person in a public place by means of a weapon or device which would be hazardous to the lives of more than one person.

3. The Appellant murdered two or more persons pursuant to one act or one scheme or course of conduct.

On September 22, 1998, the jury found the existence of the first and second aggravating circumstances beyond a reasonable doubt. The jury recommended the death penalty and the

trial judge sentenced Locklair to death. Locklair appeals his death sentence and conviction, raising the following issues:

(1) Whether the trial judge erred by refusing to charge voluntary manslaughter where there was evidence Locklair was involved in a domestic dispute with the victim and the victim's mother threw a cigarette case at him immediately before he shot the victim?

(2) Whether the trial judge erred by ordering Locklair to submit to a psychiatric examination over his objection where he had already been judged fit to stand trial, was not asserting insanity, and had not given notice that he would plead guilty but mentally ill ("GBMI")?

(3) Whether the trial judge erred by instructing the jury on the statutory aggravating circumstance contained in S.C.Code Ann. § 16–3–20(C)(a)(3) (1976), the "great risk of death" aggravator?

(4) Whether the trial judge erred by instructing the jury on the statutory aggravating circumstance contained in S.C.Code Ann. § 16–3–20(C)(a)(2) (1976), the "prior murder conviction" aggravator, where Locklair did not have a prior conviction for murder at the time the murder was committed and his conviction for the other murder came after the homicide in this case?

(5) Whether Locklair is entitled to a new sentencing hearing even if one of the aggravating circumstances is held to have been properly submitted?

## LAW/ANALYSIS

### I. Voluntary Manslaughter

Locklair argues that the trial judge erred by refusing to charge voluntary manslaughter because: (1) there was evidence of a domestic dispute between Locklair and Bridges; and (2) Bridges' mother threw a cigarette case at him immediately before he shot Bridges. We disagree.

"Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *State v. Johnson*, 333 S.C. 62, 508 S.E.2d 29 (1998). Both heat of passion and sufficient legal provocation must be present at the time of the killing to constitute

voluntary manslaughter. *State v. Walker*, 324 S.C. 257, 478 S.E.2d 280 (1996) (citations omitted). Sudden heat of passion upon sufficient legal provocation that mitigates a felonious killing to manslaughter must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called "an uncontrollable impulse to do violence." *State v. Gardner*, 219 S.C. 97, 64 S.E.2d 130 (1951) (citing *State v. Davis*, 50 S.C. 405, 27 S.E. 905 (1897)). Where death is caused by use of a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation. *Id.* at 104, 64 S.E.2d at 134. Rather, when death is caused by the use of a deadly weapon, the opprobrious words must be accompanied by the appearance of an assault—by some overt, threatening act—which could have produced the heat of passion. *State v. Lowry*, 315 S.C. 396, 434 S.E.2d 272 (1993) (citing *State v. Judge*, 208 S.C. 497, 38 S.E.2d 715 (1946)).

 It is proper for a trial judge to refuse to charge voluntary manslaughter in a murder case where it very clearly appears there is no evidence whatsoever tending to reduce the crime from murder to manslaughter. *State v. Davis*, 278 S.C. 544, 298 S.E.2d 778 (1983). This Court has held in several cases that it is proper to charge voluntary manslaughter where the defendant and the victim had been in a heated argument prior to the murder. *See State v. Wiggins*, 330 S.C. 538, 500 S.E.2d 489 (1998) (holding that evidence tended to show defendant acted in sudden heat of passion where defendant was in a heated argument with victim and feared for his life because victim threatened him); *State v. Lowry*, 315 S.C. 396, 434 S.E.2d 272 (1993) (holding that a voluntary manslaughter charge was necessary where the defendant and the victim were in a heated argument and victim was about to initiate a physical encounter when shooting occurred); *State v. Davis*, 278 S.C. 544, 298 S.E.2d 778 (1983) (holding voluntary manslaughter charge was proper where a witness testified that defendant and victim had been fighting). These cases are distinguishable from the instant case because there is no evidence that Locklair and Bridges were in a heated argument prior to the murder. According to Locklair's hand written confession,

Tammy got smart with me and I am suppose to be on Zoloft med. but I lost my perscription [sic]. After she got smart with me & started to walk off, I grabbed the gun. Her mom threw a cig. case at me, her dad was trying to stop me and Allen also.

All Locklair claims is that Bridges "got smart" with him. However, words alone, no matter how opprobrious, are not sufficient to prove legal provocation when a deadly weapon is used. *See Gardner*, 219 S.C. at 104, 64 S.E.2d at 134. Also, "getting smart" with someone would not naturally disturb the sway of reason of an ordinary person and produce an uncontrollable impulse to do violence. *Id.*

There is no evidence in the record that indicates Bridges and Locklair were fighting prior to the incident or that Bridges threatened Locklair in any way. According to Nichols, Bridges calmly spoke to Locklair and never raised her voice. When Nichols testified as to the conversation between Locklair and Bridges, he did not note any insulting or threatening language. Nichols described the incident in the following testimony:

**Nichols:** Tammy said what's wrong with you, Jimmy. He said what, what. And she said what have you done, and he said what are you talking about Tammy. And he said, she said you didn't have to do all those things. She started talking about he cut up her clothes or cut up a check or put water or something or something to that effect all in there. And she was asking him you know why in the world did you do that. You didn't have to do all that. It wasn't necessary for you to do all that stuff. . . .

**Question:** Okay, now how was she talking to him there?

**Nichols:** *Just in a, a monotone.* She was just wondering you know just, you know like you know why, why would you do something like that. Just about the same tone I am. . . . *There was never any yelling or anything of that nature.*

**Question:** Okay. And what happens after, as, as that's going on or, or after that?

**Nichols:** . . . And Jimmy asked Tammy, she kept saying no, and he said let me just talk to you for a minute.

Come here. Just let me talk to you for a minute by yourself. Please just, just listen to me, hear me out, and you know that type of thing. And she said no, Jimmy, no.... She said no, Jimmy, I'm not coming back to you. If I'm not mistaken, that was her last words. And I pushed the clutch in, and he, he paused for just a second, and then he, he reached for the dash. He opened up my dash, And when he reached for the dash, I immediately, I grabbed hold of him. (emphasis added).

Therefore, since Bridges did not take any overt physical actions against Locklair, even the most liberal construction of her words do not reduce the crime to manslaughter.[1]

▬▬▬ Provocation necessary to support a voluntary manslaughter charge must come from some act of or related to the victim in order to constitute sufficient legal provocation. *State v. Tucker,* 324 S.C. 155, 478 S.E.2d 260 (1996). "The provocation *of the deceased* must be such as naturally and instantly produces in the mind of a person ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror, rendering the mind incapable of cool reflection." *State v. Franklin,* 310 S.C. 122, 125, 425 S.E.2d 758 (Ct.App.1993), *overruled on other grounds by Brightman v. State,* 336 S.C. 348, 520 S.E.2d 614 (1999) (emphasis added). Locklair argues that the jury could find voluntary manslaughter in this case because Williams, Bridges' mother, threw a cigarette case at Locklair prior to the shootings. First, the evidence shows that Williams threw the cigarette case at Locklair *after* he grabbed the gun to kill Bridges. According to Locklair's written statement: "After she got smart with me & started to walk off, I grabbed the gun. Her mom threw a cig. case at me, her dad was trying to stop me & Allen also."

---

1. Locklair argues that *State v. Kahan,* 268 S.C. 240, 233 S.E.2d 293 (1977) is persuasive. In *Kahan,* the trial judge instructed the jury on voluntary manslaughter when there was evidence that the couple had been arguing at a Christmas party several hours before the shooting and there were no witnesses to the shooting. This Court ruled the voluntary manslaughter instruction was proper because the defendant claimed his wife's death was a suicide and the jury was required to decide whether he murdered his wife. The evidence they argued earlier that evening was circumstantial evidence that he killed her in sudden heat of passion. *Kahan* does not hold that words alone constitute sufficient legal provocation.

Second, this overt act was made by a third party, not the deceased, and South Carolina has not recognized sufficient legal provocation from a third party that can be transferred to the victim.[2] Finally, throwing a cigarette case would not naturally render the mind of an ordinary person incapable of cool reflection and produce an uncontrollable impulse to do violence. *Gardner, supra.*

## II. Psychiatric Examination

Locklair argues the trial judge abridged his Fifth Amendment rights by ordering him to submit to a psychiatric examination where he did not assert an insanity defense and did not give notice that he would plead guilty but mentally ill ("GBMI"). We disagree.

According to S.C.Code Ann. § 44–23–410 (Supp. 1998), circuit court judges have the inherent duty to order a competency examination if there is reason to believe that the person charged with the criminal offense is not fit to stand trial. Section 44–23–410 states:

> Whenever a judge of the Circuit Court or Family Court has reason to believe that a person on trial before him, charged with the commission of a criminal offense or civil contempt, is not fit to stand trial because the person lacks the capacity to understand the proceedings against him or to assist in his

---

**2.** Locklair cites the Texas case, *Sattiewhite v. Texas*, 786 S.W.2d 271 (Tex.Crim.App.1989), for the proposition that provocation on the part of the deceased or a third party acting in concert with the deceased will support a manslaughter verdict. However, a Texas statute specifically defines sudden passion as "passion directly caused by and arising out of provocation by *the individual killer or another acting with the person killed* which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* at 287 (citing Tex.Code Ann. § 1904(b)) (emphasis added). South Carolina does not have a comparable statute.

Locklair also relies on the South Carolina case, *State v. Wyatt*, 317 S.C. 370, 453 S.E.2d 890 (1995) for the proposition that provocation by a third party would support a voluntary manslaughter verdict. In *Wyatt*, the appellant hit his wife at a race track and then was confronted by an angry crowd as he tried to leave. The appellant shot two men who tried to prevent him from leaving. The appellant's theory in *Wyatt* was self-defense. Therefore, under the facts in *Wyatt*, the provocation derived from the victims' actions, not his wife's, who was merely a third party to the incident.

own defense as a result of a lack of mental capacity, the judge *shall:*

(1) order examination of the person by two examiners designated by the Department of Mental Health ...; or

(2) order the person committed for examination and observation to an appropriate facility of the Department of Mental Health or the Department of Disability and Special Needs....

S.C.Code Ann. § 44-23-410 (Supp.1998) (emphasis added). Despite the mandatory language of the statute requiring a judge to order a competency examination if there is reason to believe that a person charged with a criminal offense is not fit to stand trial, ordering a competency examination is within the discretion of the trial judge and a refusal to grant an examination will not be disturbed on appeal absent a clear showing of an abuse of discretion. *State v. Singleton,* 322 S.C. 480, 472 S.E.2d 640 (Ct.App.1996). Where insanity is interposed as a defense in a criminal prosecution, compulsory examination of the accused by experts for the purpose of determining his mental condition does not violate either the constitutional protection against self-incrimination or the constitutional guaranty of due process of law. *State v. Myers,* 220 S.C. 309, 67 S.E.2d 506 (1951). Locklair argues that while a trial judge may order a psychiatric examination where insanity is asserted as a defense, there is no authority that indicates a trial judge has the authority to order an examination when a defendant provides no notice that he will plead GBMI, and GBMI is never pled. We disagree.

The trial judge in this case has the inherent, discretionary authority to order an independent psychiatric evaluation of Locklair if he believed Locklair was not fit to stand trial or if he believed that Locklair's mental competency would be an issue at trial. The mental competency of the defendant to stand trial is a baseline inquiry by the court. In order to protect the legal process and preserve the integrity of the trial, a trial judge has the authority to order a psychiatric evaluation of the defendant when his or her competency may be in question.[3]

---

**3.** Other jurisdictions require a defendant to submit to a psychiatric examination when he or she raises issues of mental competency. *See*

 The trial judge was under the impression that Locklair's mental condition may be made an issue at trial. At the May 29, 1998 hearing, the trial judge heard the State's motion for an independent mental examination. Defense counsel provided a copy of their expert's report on Locklair's mental condition. Defense counsel agreed with the trial judge's summary of their expert's conclusions:

> **The Court:** And in that report, it indicates that the defendant suffers or did suffer from some type of mental illness that would cause him to lack capacity to confirm [sic] his conduct to the requirements of the law at the time of the alleged offense?
>
> **Defense Counsel:** Yes, sir.
>
> **The Court:** *And the defendant intends to offer such evidence at trial of the case either in the guilt phase and or the penalty phase?*
>
> **Defense Counsel:** *That is correct sir.*
>
> **The Court:** And because of that, the State wishes to have an independent examination conducted to either rebut that evidence or to confirm that evidence I would assume?
>
> **Solicitor:** That's correct, Your Honor. (emphasis added)

By stating that Locklair may offer evidence of his mental illness at trial, defense counsel opened the door to the issue of Locklair's mental health.

 Furthermore, Locklair has shown no conceivable prejudice from the psychiatric examination. "Error without prejudice does not warrant reversal." *State v. McWee,* 322 S.C. 387, 393, 472 S.E.2d 235, 239 (1996). Locklair claims the State used evidence from his examination with Dr. Lewis to successfully urge that he be sentenced to death. Dr. Lewis conducted the examination for the court and found that Locklair had a normal family life and childhood. Specifically,

---

*generally State v. Jackson,* 77 N.C.App. 491, 335 S.E.2d 903 (1985) (holding that when defendant asserts insanity as a defense, court has authority to require defendant to submit to a mental examination by a court-appointed psychiatrist); *State v. Myers,* 239 N.J.Super. 158, 570 A.2d 1260 (1990) (holding that defendant who asserts the battered women's syndrome defense must submit to examination by appropriate experts selected by the State).

Locklair takes issue with the following argument by the solicitor:

> They told you or it was told to you that he had a normal childhood, his grades were normal, he finished high school, he had a good job, he was never abused by anybody. In spite of his education, in spite of all this background, this is where he ends up. That's what he's done with that start in life. He had better than many other people I submit to you.

However, Locklair's own social worker provided an independent basis for this information. The State did not have to rely on Dr. Lewis' report because Locklair's social worker testified that Locklair had a simple life, lived a quiet existence, was an average student, and had consistent employment.

### III. Statutory Aggravating Circumstance—S.C.Code Ann. § 16-3-20(C)(a)(3)

Locklair argues that the trial judge erred by refusing to direct a verdict on the "great risk of danger" aggravator. This statutory aggravating circumstance states that the jury can consider whether "the offender by his act of murder knowingly created a great risk of danger to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person" when deciding the appropriate punishment for murder. S.C.Code Ann. § 16-3-20(C)(a)(3) (1976). We disagree.

"In determining whether to submit an aggravating circumstance to the jury, the trial court is concerned with the existence of the evidence, not its weight." *State v. Smith,* 298 S.C. 482, 485, 381 S.E.2d 724, 726 (1989). The trial judge should submit the aggravator to the jury if "supported by any evidence direct or circumstantial." *Id.* The "great risk of danger" aggravator was properly submitted to the jury because there was ample evidence that suggested Locklair put the lives of more than one person in danger in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

In construing statutes, words must be given their plain and ordinary meaning without resort to subtle or forced construction in attempt to expand the statute. *State v. Sims,* 304 S.C. 409, 405 S.E.2d 377 (1991). Here, the statute man-

dates that the offender create a great risk of danger to more than one person in a "public place." This incident took place in a public place because it occurred on a public street and in William's front yard in a small mill village. There were many people in the general vicinity of the incident and there were several children playing on the public street when the incident occurred.

Locklair argues that a firearm is not a "weapon or device which would normally be hazardous to the lives of more than one person." Locklair claims that the statute contemplates the use of a bomb or other explosive device. We disagree and find that a gun is the type of weapon contemplated by the statute. The statutory aggravator only requires that the weapon used be "normally hazardous to the lives of more than one person." Requiring the use of a bomb or other explosive device would be a forced construction of the statute adding terms not intended by the legislature.[4]

Locklair argues that this was a simple case of a victim being shot at close range, not the type of incident contemplated by the statute. However, the trial testimony does not support this assertion. According to Nichols' testimony, Locklair put more than one person at great risk of danger because he attempted to fire the gun several times, but the safety was on. After he shot Bridges, Locklair pointed the gun at Williams' home where there were children inside. Nichols was forced to tackle Locklair to stop him and Robert Williams, the victim's stepfather, had to struggle with Locklair to retrieve the gun. According to the trial testimony, the gun was dropped several times during the struggle with shots being fired in different directions. Also, at the very least, Nichols and Robert Williams, were placed in great danger as they attempted to stop Locklair from firing and retrieve the gun. Finally, Locklair put many people at great risk of danger. Nichols, Robert William, Betty Williams, Dewey Morgan, and several children playing in the street were all within firing range when the shooting occurred.

---

4. Other jurisdictions have held that a gun fired in the direction of two persons satisfies the statutory aggravator. *See e.g., North Carolina v. Moose,* 310 N.C. 482, 313 S.E.2d 507 (1984); *Jones v. Georgia,* 243 Ga. 820, 256 S.E.2d 907 (1979); *Moran v. Nevada,* 103 Nev. 138, 734 P.2d 712 (1987).

## IV. Statutory Aggravating Circumstance—S.C.Code Ann. § 16–3–20(C)(a)(2)

Locklair argues that the trial judge erred by instructing the jury on the statutory circumstance contained in S.C.Code Ann. § 16–3–20(C)(a)(2) (1976) since Locklair did not have a prior conviction for murder at the time the shooting occurred in this case. We disagree.

 S.C.Code Ann. § 16–3–20(C)(a)(2) states that the trial judge may include in his instruction the following statutory aggravator if supported by evidence: "Murder was committed by a person with a prior record of conviction of murder." Locklair shot and killed Bridges on April 26, 1995. At the time of her murder, Locklair had not been indicted or convicted of Christopher Jones' murder. On June 5, 1995, Locklair was indicted for the Jones' murder, and on June 14, 1995, Locklair was convicted and sentenced to life imprisonment. The trial in this case did not commence until September 20, 1996. Therefore, Locklair did not have a prior murder conviction until the date of Bridges' murder *trial.* Locklair argues that the prior murder conviction must have occurred prior to the date of Bridges' *murder* in order for the judge to charge the aggravating circumstance. We disagree.

In *State v. Sims,* 304 S.C. 409, 405 S.E.2d 377 (1991), this Court interpreted the language of S.C.Code Ann. § 16–3–20(C)(b)(1) (Supp.1989) which contained the following statutory mitigating circumstance: the defendant "had no significant history of prior criminal convictions involving the use of violence against another person." The Court interpreted the word "prior" to mean prior to trial, rather than prior to the time of the crime. At the time Sims committed the crime in South Carolina, he had no history of prior criminal convictions because he was not convicted of his California crimes until after he committed the crimes in South Carolina. *Id.* This Court focused on the plain language of the statute in *Sims* and determined that if the legislature wanted the prior convictions to occur at the time of the crime, they would have specified it in the statute, as they did in several other statutory mitigating circumstances. *Id.* at 423, 405 S.E.2d at 385 (citing section 16–3–20(C)(b)(7) and section 16–3–20(C)(b)(9) as examples where the legislature specified that the mitigating circum-

stance had to occur at the time of the crime). Similarly, the legislature did not specify in section 16–3–20(C)(a)(2) that the defendant must have a prior murder conviction at the time of the crime in order to receive an instruction on the aggravating circumstance.

South Carolina's death penalty statute was "patterned after the death penalty statutes of our sister state Georgia." *State v. Shaw*, 273 S.C. 194, 255 S.E.2d 799 (1979), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991). In *Stephens v. Hopper*, 241 Ga. 596, 247 S.E.2d 92 (1978), the Georgia Supreme Court interpreted a statutory aggravating circumstance which provided in part that "the offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony." The Georgia Supreme Court concluded that the jury should consider the record as of the time of the sentencing proceeding, and not at the time of the crime. *Id.* at 96. "To conclude otherwise would produce the intolerable result that an offender with no prior record could commit numerous separate murders one after the other before being apprehended, and then, at the trials for those murders, could never receive death under this aggravating circumstance even though convicted of each and ever one of the murders." *Id.* at 96–97.

Other jurisdictions support the above proposition. North Carolina, Mississippi, and Nevada authorize the death penalty where the defendant was "previously convicted" of another qualifying crime before trial. These jurisdictions have held that the "previous conviction" can occur before the trial. *See, e.g., State v. Warren*, 348 N.C. 80, 499 S.E.2d 431 (1998) (holding that the "previously convicted" aggravating circumstance includes convictions which occur after the event, provided the conviction occurs before sentencing); *Jones v. State*, 381 So.2d 983 (Miss.1980) (holding the word "previously," used in a statute providing for the use of prior convictions, relates to the time of trial and, thus, defendant's armed robbery conviction, which was entered after he committed murder, could be considered during the sentencing phase of his murder trial). In *Calambro v. State*, 114 Nev. 106, 952 P.2d 946 (1998), the Nevada Supreme Court makes a persuasive policy

argument for why the "prior conviction" aggravator should be considered at the time of sentencing:

> The statute was never intended to operate on the vagaries of conviction sequences. Instead, the focal point is the time of sentencing. The sentencing panel is entitled to consider all relevant aspects of the defendant's criminal background prior to rendering sentence. The fact that Gallego murdered two victims after killing the two victims in the instant case is not relevant to the dictates of the statute. The clear language of the statute required only that Gallego stood convicted of the California murders at the time of the introduction of the evidence in the penalty phase of the present proceeding. It would be both absurd and counterproductive for this court to construe the plain language of the statute so as to exclude convictions of murders or crimes of violence occurring after the primary offense but before the penalty phase of a defendant's trial. This we refuse to do.

*Id.* at 947 (citing *Gallego v. State,* 101 Nev. 782, 711 P.2d 856, 863–864 (1985)).

Because the South Carolina General Assembly did not specify that the prior convictions had to occur before the commission of the crime, we find that for purposes of section 16–3–20(C)(a)(2), prior convictions have to occur by the time of the *sentencing proceeding*. The emphasis in the sentencing phase of a capital trial is on the character of the defendant. The purpose of the sentencing phase in a capital trial is to direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender. *State v. Ard,* 332 S.C. 370, 505 S.E.2d 328 (1998). According to this Court in *State v. Tucker,* 324 S.C. 155, 478 S.E.2d 260, 270 (1996), "cases in South Carolina and around the country have consistently found a defendant's prior criminal record to be highly relevant in sentencing; any limitations have been directed to admitting only felonies or violent crimes." *See, e.g., Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976) ("[W]e believe that in capital cases . . . the Eighth Amendment . . . requires consideration of the record of the individual offender . . . as a constitutionally indispensable part of the process of inflicting the penalty of death."); *State v. Stewart,* 283 S.C. 104, 320 S.E.2d 447 (1984)

("[I]nformation concerning prior criminal convictions shall be admissible as additional evidence during the sentencing or representing [sic] phase of a capital trial."); *State v. Jackson,* 608 So.2d 949, 954 (La.1992) ("Evidence of convictions of serious unrelated crimes is extremely probative of and relevant to the character and propensities of the defendant and may be useful for the jury to evaluate in performing its awesome task of deciding whether or not to recommend execution."). Therefore, Locklair's prior murder conviction was relevant character evidence that was properly presented in the sentencing phase of the trial.

## V. New Sentencing Hearing

Locklair argues that he is entitled to a new sentencing hearing even if this Court holds one of the two aggravating circumstances found by the jury was properly submitted for its consideration. According to Locklair, *Tuggle v. Netherland,* 516 U.S. 10, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995) mandates reversal under these circumstances. Because we find that both statutory aggravating circumstances were properly submitted to the jury, it is not necessary to address the *Tuggle* issue.

### CONCLUSION

After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor, and that the jury's finding of aggravating circumstances is supported by the evidence. Further, the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *See State v. Rosemond,* 335 S.C. 593, 518 S.E.2d 588 (1999); *State v. Humphries,* 325 S.C. 28, 479 S.E.2d 52 (1996); *State v. Williams,* 321 S.C. 327, 468 S.E.2d 626 (1996). Therefore, the conviction and sentence are **AFFIRMED.**

MOORE, WALLER, BURNETT, and PLEICONES, JJ., concur.