PER CURIAM:

THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State,       
Respondent,
 
 
 

v.

 
 
 
Jeremy Jerome Knight,       
Appellant.
 
 
 

Appeal From Spartanburg County
J. Derham Cole, Circuit Court Judge

Unpublished Opinion N0. 2004-UP-105
Submitted December 23, 2003  Filed 
 February 18, 2004

AFFIRMED

 
 
 
Deputy Chief Attorney Joseph L. Savitz, III, of Columbia, 
 for Appellant.
Attorney General Henry Dargan McMaster, Chief Deputy Attorney 
 General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, 
 Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor  
 Harold W. Gowdy, III, of Spartanburg, for Respondent.
 
 
 

PER CURIAM:  Jeremy Jerome Knight 
 was convicted of murder and sentenced to life imprisonment.  Knight appeals, 
 arguing the circuit court erred by refusing to charge the jury on the law of 
 voluntary manslaughter.  We affirm.
FACTUAL/PROCEDURAL HISTORY
Knight and Miranda Aull were friends.  Together, they 
 attended a small party at the apartment of Bryant Cheeks and Jeremy Petty. During 
 the evening, they went to Pacolet, S.C., to attend another party and then returned 
 in the early morning hours to continue the party at the first residence.  Everyone 
 was drinking alcohol, and some were using drugs.  Knight consumed both alcohol 
 and drugs. 
Aull spent the rest of the night in Bryant Cheeks 
 bedroom, where the two had sexual relations.  Knight slept on the living room 
 couch, but according to Cheeks, he frequently knocked on the bedroom door, pestering 
 Cheeks and Aull.  The next morning Cheeks arose, dressed, and left for work.  
 Aull told him she was going to her grandmothers house to change and shower 
 but would return later in the afternoon when Cheeks got off work at 3:00 p.m.  
 Cheeks attempted to arouse Knight to send him home, but Knight said he was too 
 drunk to go home and asked to remain on the couch until later in the day.  Petty 
 was asleep in his bedroom with his door closed. 
Pettys mother subsequently arrived to awaken Petty.  
 As she walked by the slightly opened door to Cheeks bedroom, she saw Knight 
 laying spread-eagled on the bed.  She awoke Petty, and as she was leaving the 
 home, Knight came out of the bedroom with scratches on his face.  The wounds 
 were white, with fresh blood coming from them. 
When Cheeks returned from work in the afternoon, he 
 found Aull lying dead on the bed.  She was stiff and cold.  Lying on the bed 
 around her were pieces of a necklace, including a sharks tooth witnesses testified 
 was always worn by Knight.  DNA samples taken from Aulls fingernail scrapings 
 matched the DNA of Knight with a probability of 6.3 trillion to one.  
When Knight was arrested, he gave two, conflicting 
 statements.  The first read as follows:

Around dusk on Sunday night (2/24 of 02) I drove my blue 
 Toyota Cressida to Jerome Pettys duplex.  When I got there, Jerome was there, 
 and his roommate, Bryant Cheeks.  Also there was Miranda Aull and several other 
 people.  Everybody was drinking.  Later on Miranda went into one of the bedrooms 
 and changed clothes.  She came out half naked and walked around.  Later on someone 
 said something about going to a liquor house in Pacolet.  Me and Jerome rode 
 in my, my car, and Bryant, Miranda and the rest of the folks rode with Bryant.  
 We stayed at the liquor house until a fight broke out.  Miranda rode back with 
 me and Jerome.  When I got back to the duplex it was me, Jerome, Bryant and 
 Miranda.  I started watching a video in the living room.  Miranda went Jerome 
 - - went with Jerome to his bedroom.  Less than an hour later Miranda came out 
 of Jeromes bedroom.  She was naked.  She knocked on Bryants door and told 
 him to unlock the door.  He let her in.  I knew that they were having sex - 
 - that they were having sex with her.  At some point I remember knocking on 
 Bryants door.  Finally he came.  I told him to tell her to come up there because 
 I wanted to talk to her.  She never came out.  I passed out.  The next thing 
 I know I am waking up.  Im face down on the floor at the foot of Bryants bed.  
 I remember hearing Bryant, but never saw him.  This is when I got up on the 
 bed with Miranda.  Miranda was in and out of sleep.  I dont remember exactly 
 what I said, but I was trying to tell her that her actions did not look good 
 that preceded her.  I tried to set her up behind.  She became upset and started 
 cursing me.  She said basically that it was her life and she could do whatever 
 she wanted to.  She came at me with her hand and scratched me in the eye.  I 
 got physical in a defensive way.  I was trying to get neutral control.  I used 
 one of my forearms to hold her down on the bed and across her neck.  She was 
 still fussing and cussing.  She got up again, and I think thats when she scratched 
 me on the neck.  I held her down for a couple of moments.  I got off of her 
 and told her that I was leaving.  I saw that she had a tear running down her 
 cheek.  I didnt hear her crying.  I remember seeing Jeromes mother.  I was 
 not laying on - - I was not laying on Miranda when I saw her.  I walked outside 
 and in my car.  I left and went to Walkers house, but he wasnt up.  So I left 
 and went back to Jerome.  Jerome was there, and I talked to him for a couple 
 of minutes.  I left and went back to Walkers house.  I spoke with him about 
 my car and then went home.  Later that afternoon I got a phone call from Mr. 
 Wingo.  He said M. F. why did you kill my niece, or did you kill my niece.  
 I asked what are you talking about.  He asked me if I was over there last night, 
 and I told him I was there all night.  This statement written by Investigator 
 Yown as I, Jeremy Jerome Knight, directed him what to write.  End of Statement. 

Subsequently, Knight gave the following statement:

On 2/25/02 everything that I told the detectives up until 
 the time of the incident is true.  As far as the incident goes, I tried to conversate 
 with Miranda Aull about things I felt she was doing that she didnt need to 
 do. She didnt want to hear it.  When I tried to talk to her, she kept turning 
 her back.  As a friend, I tried to get her to listen.  She basically told me 
 to stay out of it, that from past conversations about similar matters I felt 
 like I couldnt let it go, because I didnt want to see her get treated the 
 way she has been treated in the past.  When she wouldnt listen and turned her 
 back, I tried to turn her around so she couldnt turn her back again so she 
 could hear what I had to say.  I held her shoulders down.  She got physical 
 back.  Thats when the matter got out of hand.  At that point I began to choke 
 her with one hand.  When she scratched me, she began squeezing my face.  I began 
 to use both hands to choke her.  I wanted her to hear what I had to say.  I 
 felt disappointment, let down.  I had put so much into the friendship.  I let 
 her go before she stopped breathing.  She took a deep breath.  She was gasping 
 for air.  At that point I was scared.  I realized she was not breathing.  I 
 then began to pray and use C.P.R.  I didnt know if I was doing it right.  I 
 tried.  I covered her all the way up except her head.  I was very scared.  I 
 didnt know what to do.  I kept asking myself over and over again,  please, 
 God dont let this be.  I left the house.  It wasnt long at all after she died.  
 I drove to Cowpens to see my friend Walker.  He wasnt there.  I still felt 
 I need to do something.  I didnt know what I was so - - I didnt know what 
 I was so scared.  When I went back to Jeromes house where Mirandas body was, 
 I wanted to do something.  I wanted to call the police, but I was too scared.  
 I talked to Jerome there.  I asked him for some water for the car.  He let me 
 fill it up, and then I left.  Before I left, I did stick my head in the door 
 to see if she was still dead.  She was still lying in the same position.  I 
 left and went back to Cowpens to Walkers house.  He wasnt home.  I sat with 
 him and his wife.  I wanted to tell them and ask them what to do.  I was too 
 scared.  I left there.  I went home.  I got home and laid down to bring myself 
 together so I could do something.  I needed to do something.  Mirandas uncle 
 called and asked me if I, why did I do this to my niece, why did you kill my 
 niece.  I told him what are you talking about.  I got even more scared.  I knew 
 I had to do something.  I had to tell somebody.  I went to my girlfriends house.  
 Her name is Tawnya Hamilton in Chesnee.  I was going to tell her everything.  
 I was also trying to call the detective who left his number for me to call with 
 my mother.  He didnt answer the phone.  I didnt leave a message.  I wanted 
 to talk to him.  I told my girlfriend some of what happened.  My brother came 
 by and I spoke to him.  He told me what people are saying, and then the detective 
 showed up.  I had never felt like this before.  I never felt anger, just disappointment.  
 We would talk a certain way about things, and then her actions were different.  
 This upset me she was carrying herself like that.  I always respected her.  
 I always took time out for her if she needed me to show her I cared.  We never 
 argued, just small disappointments about view points.  I went  I want her family 
 to know I never meant to hurt her.  I only wanted her to listen to me.  I felt 
 like what I had to say would have helped her to do the right things I know she 
 really wanted to do in life.  I swear all this is true.  I gave this statement 
 voluntarily.  I asked detective Steve Denton to write this for me as I gave 
 it to him.  

Both statements were introduced during the trial 
 of the case.  Knight did not testify.  At the conclusion of the evidence, the 
 defense requested a charge on the lesser-included offenses of voluntary and 
 involuntary manslaughter, [1] 
 arguing the statements provided a basis for allowing the jury to consider them.  
 The circuit court declined to charge voluntary manslaughter on the grounds that, 
 neither of Knights statements provided a basis for establishing the crime resulted 
 from heat of passion with sufficient legal provocation, both of which are elements 
 of the offense.  Knight appeals.
LAW/ANALYSIS
Knight argues his statements lead to an inference 
 Knight killed Aull while the two were fighting, and thus, the circuit court 
 erred by refusing to charge the jury on the law of voluntary manslaughter.  
 We disagree.
Voluntary manslaughter is the unlawful killing 
 of a human being in sudden heat of passion upon sufficient legal provocation.  
 State v. Locklair,  341 S.C. 352, 359-360, 535 S.E.2d 420, 424 (2000) 
 (quoting State v. Johnson, 333 S.C. 62, 65, 508 S.E.2d 29, 31 (1998)).  
 Both heat of passion and sufficient legal provocation must be present at the 
 time of the killing to constitute voluntary manslaughter. State v. Locklair,  
 341 S.C. at 359-360, 535 S.E.2d at 424 (quoting State v. Walker, 324 
 S.C. 257, 260, 478 S.E.2d 280, 281 (1996)).  Sudden heat of passion upon sufficient 
 legal provocation that mitigates a felonious killing to manslaughter must be 
 such as would naturally disturb the sway of reason, and render the mind of an 
 ordinary person incapable of cool reflection, and produce what, according to 
 human experience, may be called an uncontrollable impulse to do violence. 
 State v. Locklair,  341 S.C. at 360, 535 S.E.2d at 424 (quoting State 
 v. Gardner, 219 S.C. 97, 104-105, 64 S.E.2d 130, 134 (1951)).  
It is proper for a trial judge to refuse to charge 
 voluntary manslaughter in a murder case where it very clearly appears there 
 is no evidence whatsoever tending to reduce the crime from murder to manslaughter. 
 State v. Locklair,  341 S.C. at 360, 535 S.E.2d at 424 (citing State 
 v. Davis, 278 S.C. 544, 546, 298 S.E.2d 778, 779 (1983)).
Knight argues his statements provide evidence of 
 fighting between himself and the victim, thereby establishing a factual basis 
 for concluding he acted in the sudden heat of passion with sufficient legal 
 provocation.
Considering either version of events as stated 
 by Knight, no facts exist indicating Knight and Aull were fighting.  Rather, 
 the evidence indicates Knight attempted to physically and verbally restrain 
 Aull, while she attempted to defend herself.  This evidence, without more, is 
 insufficient to establish facts or inferences demonstrating a legal provocation 
 for reducing the crime from murder to voluntary manslaughter.  Thus, the circuit 
 court did not err by denying Knights motion to charge the jury on the law of 
 voluntary manslaughter.  
CONCLUSION
For the foregoing reasons, Knights conviction 
 is 
AFFIRMED.
GOOLSBY, HOWARD, and KITTREDGE, JJ., concurring.

 
 [1] Knight does not appeal the denial of his request 
 to charge involuntary manslaughter.